# IN THE SUPREME COURT OF TEXAS

═══════════
No. 12-0522
═══════════

WASTE MANAGEMENT OF TEXAS, INC., PETITIONER,

v.

TEXAS DISPOSAL SYSTEMS LANDFILL, INC., RESPONDENT

═══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════

**Argued December 3, 2013**

JUSTICE WILLETT delivered the opinion of the Court.

*When the debate is lost,*
*slander becomes the tool of the loser.*[1]

This defamation case specifically concerns libel (defamation in written form), but Socrates'

perception of slander (defamation in spoken form) applies with no less force.

In 1995, Waste Management of Texas, Inc. (WMT) and Texas Disposal Systems Landfill,

Inc. (TDS) competed for waste-disposal and landfill-services contracts with the cities of Austin and

San Antonio. Fearing it was losing the bidding debate, WMT anonymously published a community

"Action Alert" claiming that TDS's landfills were less environmentally sensitive than they actually

were.

---

[1] This quote is widely, if not verifiably, attributed to Socrates, who taught Plato, who taught Aristotle, who taught Alexander the Great.

The right to speak freely is, of course, an enumerated right enshrined in both the Texas[2] and Federal[3] constitutions. But free speech is not absolute[4] and does not insulate defamation.

Today's case distills to this question: To what degree is WMT liable for libel? To answer that question, we consider three separate inquiries:[5]

1.      Can a corporation even suffer reputation damages?

2.      If so, are those damages economic or non-economic damages for purposes of the statutory cap on exemplary damages?

3.      Does the evidence support the damages awarded by the jury?

---

[2] TEX. CONST. art. I, § 8.

[3] U.S. CONST. amend. I.

[4] The Texas Bill of Rights itself acknowledges that free speech is not inviolate. TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, *being responsible for the abuse of that privilege* . . . .") (emphasis added). Several Texas statutes likewise limit speech. *See, e.g.*, TEX. BUS. & COM. CODE §§ 17.01 *et seq.* (prohibiting a false going-out-of-business advertisement, and prohibiting deceptive advertising); TEX. ELEC. CODE §§ 253.151 *et seq.* (imposing contribution and expenditure limits in judicial elections). We offer no opinion on the constitutionality of these statutes.

[5] We distill from the numerous and varied issues raised by WMT the relevant ones necessary to dispose of this appeal.

The amici curiae[6] see this case as an overdue opportunity to scrap the traditional distinction

between per se and per quod defamation,[7] citing many commentators[8] and jurisdictions[9] that lament

the labels' needless opacity.[10] Amici believe eliminating the distinction would harmonize Texas

defamation law and its application. But we need not consider these broader issues to decide today's

case.[11]

We hold that a corporation may suffer reputation damages, and that such damages are non-

economic in nature. Also, while the evidence in this case is sufficient to support the award of

remediation costs, the evidence is *not* sufficient to support the award of reputation damages. Finally,

---

[6] Amici supporting WMT include Belo Corporation, Dow Jones & Company, Inc., Fox Television Stations, Inc., NBC Universal Media LLC, News Corp., Reporters Committee for Freedom of the Press, Reuters America, Scripps Media, Inc., and the Texas Association of Broadcasters.

[7] Defamation per se (on its face) requires no proof of actual monetary damages, while defamation per quod (dependent on context and interpretation) does require such proof. *See Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013).

[8] *See, e.g.,* 1 ROBERT D. SACK, SACK ON DEFAMATION § 2.8.1 (4th ed. 2013) ("No concept in the law of defamation has created more confusion."); RESTATEMENT (SECOND) OF TORTS § 568 cmt. b (1977) (describing the imprecise and anachronistic nature of the distinction); William L. Prosser, *Libel Per Quod*, 46 VA. L. REV. 839, 848–49 (1960) ("[I]n this maze anyone can be forgiven for losing his way.").

[9] *See, e.g.*, *Hancock*, 400 S.W.3d at 64 (quoting *Salinas v. Salinas*, 365 S.W.3d 318, 320 n.2 (Tex. 2012)) ("[T]he damages a defamation *per se* plaintiff may recover is an issue 'courts have not resolved . . . in an entirely consistent manner.'"). For example, cases discarding the distinction between the different categories of defamation or abandoning the doctrine of presumed damages include *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1242–43 (Kan. 1982); *Metromedia, Inc. v. Hillman*, 400 A.2d 1117, 1119 (Md. 1979); *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 308, 313 (Mo. 1993); *W.J.A. v. D.A.*, 43 A.3d 1148, 1150, 1159–60 (N.J. 2012); *Smith v. Durden*, 276 P.3d 943, 945 (N.M. 2012); *Newberry v. Allied Stores, Inc.*, 773 P.2d 1231, 1236 (N.M. 1989); *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978).

[10] One First Amendment scholar puts it bluntly: "The ostensibly simple classification system . . . has gone through so many bizarre twists and turns over the last two centuries that the entire area is now a baffling maze of terms with double meanings, variations upon variations, and multiple lines of precedent." 2 RODNEY SMOLLA, LAW OF DEFAMATION § 7:1 (2d ed. 2010).

[11] Notably, we have used the phrase "per quod" as it relates to defamation law only once in the history of this Court. *See Hancock*, 400 S.W.3d at 64.

3

we agree that TDS is entitled to exemplary damages, but the amount, along with allowable pre- and post-judgment interest, must be recalculated. Accordingly, we affirm in part and reverse in part the court of appeals' judgment and remand to the court of appeals for further proceedings.

## I. Background

In May 1995, TDS and the City of San Antonio began negotiating a contract for TDS to assume operations of San Antonio's Starcrest Transfer Station. The contract would have allowed TDS to haul San Antonio's waste from the Starcrest Station to TDS's landfill, starting in 1997. In 1996, the San Antonio City Council passed an ordinance authorizing the city manager to negotiate and execute a contract in accordance with the proposed agreement between San Antonio and TDS, which was attached and incorporated into the ordinance. But the parties had not yet executed a final contract by 1997—the originally proposed start date.

Concurrently with the San Antonio negotiations in 1996, the City of Austin issued a request for proposals, seeking bids from waste-disposal and landfill-services companies. TDS and WMT submitted bids and were selected to proceed to Phase II of the bidding process.

In early 1997, WMT anonymously published a community "Action Alert" memorandum, which was distributed to environmental and community leaders in Austin, including several Austin City Council members. WMT had hired a consultant, Don Martin, to draft the document. Martin gathered information from several WMT officials, who then approved, as TDS alleged, the document for publication. Martin sent the document to an Austin environmental advocate who then faxed it to a designated group of recipients. Martin focused the Alert on TDS's proposal with San Antonio regarding Starcrest Station.

The Alert effectively claimed that TDS's landfill was less environmentally sensitive than it actually was and as compared to other area landfills. Specifically, the Alert claimed that TDS's landfill in Travis County (1) had received an exception to federal environmental rules, (2) was operating without a fully synthetic liner, and (3) did not have a leachate collection system to prevent water that had come into contact with waste from contaminating groundwater. The Alert closed by urging readers to contact San Antonio city officials, Travis County officials, and the *San Antonio Express News* with any concerns.

TDS sued WMT in late 1997 for defamation, tortious interference with an existing or prospective contract, and business disparagement. TDS alleged that the Alert caused economic damages by delaying the execution of the San Antonio and Austin waste disposal contracts.[12] TDS sought compensatory and punitive damages and injunctive relief.

After TDS filed suit, WMT published a number of communications concerning TDS and its business. WMT sent a memorandum to the San Antonio Public Works Department, questioning whether the zoning ordinance of the Starcrest Station even permitted TDS to operate the Station. WMT also anonymously issued a memorandum to the San Antonio City Council and the Texas Natural Resource Conservation Commission contending that TDS's proposed contract would result in multiple permit violations. Finally, WMT issued a press release claiming TDS had "inspired" a protest demonstration and providing reasons why TDS should not be selected for the Austin

---

[12] TDS ultimately finalized its contracts with both Austin and San Antonio.

contract. TDS amended its original petition to include these publications that post-dated the original Action Alert.[13] TDS later added antitrust claims against WMT for its "attempt to monopolize."

The trial court considered motions for summary judgment and dismissed all of TDS's claims except for defamation.[14]

At trial, TDS requested an instruction on defamation per se and the related issue of presumed damages, but the trial court declined to charge the jury on either. The jury found that WMT's statements were false and that TDS had shown by clear and convincing evidence that WMT knew of their falsity or had serious doubts about their truth. The jury thus made an affirmative finding on actual malice, but it determined that TDS had suffered no actual damages as a result of the publication. The trial court entered a take-nothing judgment against TDS, which TDS appealed.

In a first appeal,[15] the court of appeals reversed, holding that the trial court erred by refusing to include a question about defamation per se in the charge. The court of appeals held that the trial

---

[13] The causes of action in TDS's amended petition remained the same: defamation, business disparagement, and tortious interference with current and prospective contracts. WMT moved for partial summary judgment, arguing that these subsequent publications were unrelated to the Action Alert and could not be considered because the amended petition arrived after the respective limitations periods had run. TDS countered, asserting a continuing course of tortious conduct. The trial court ruled for WMT, holding that the amended petition added "new, distinct, and different transactions" that did not relate back to the grounds of liability alleged in TDS's original petition, namely the Action Alert. Liability thus could not rest on the later, time-barred publications. The trial court revisited this issue later, but again resolved it in WMT's favor.

[14] As discussed in note 13, *supra*, the trial court's order granting partial summary judgment to WMT did not fully dispose of the factual issues relating to TDS's claims based on the Action Alert, because the order concerned only whether limitations had run on the later publications. The trial court later granted summary judgment in WMT's favor on TDS's tortious interference claims based on the Action Alert, preserving the defamation and disparagement claims for trial. At the conclusion of the evidence, however, the trial court dismissed TDS's disparagement claim by directed verdict. And because TDS did not raise the dismissal of its disparagement claim in the first appeal—a fact TDS concedes—it is not now before us. For more discussion on the difference between business disparagement and defamation, *see infra* at 19–20.

[15] 219 S.W.3d 563.

6

court erred because there were underlying facts regarding whether the meaning and effect of WMT's words tended to affect TDS injuriously in its business. The court of appeals remanded the case for a new trial.

In the second trial, the trial court charged the jury on defamation per se and gave related instructions on presumed damages. The jury returned a verdict in favor of TDS, awarding it $450,592.03 for reasonable and necessary expenses, $0 for lost profits, $5 million for injury to reputation, and $20 million as exemplary damages based on the jury's finding that WMT published the defamatory statements with malice. The trial court applied the statutory cap to the jury's award of exemplary damages, treating the $5 million award for injury to reputation as non-economic damages, and rendered an exemplary damage award of $1,651,184.06. WMT appealed the trial court's judgment, and the court of appeals affirmed.[16]

The parties filed cross-petitions in this Court. In one issue, TDS contends the trial court erred by categorizing its reputation damages as non-economic damages for purposes of the statutory cap on exemplary damages. In ten issues, WMT asserts evidentiary and procedural defects. We first consider whether a for-profit corporation may recover for injury to reputation.

## II. A Corporation May Recover Reputation Damages

WMT makes three arguments regarding reputation damages:

1.      Corporations cannot suffer such damages.

2.      Even if they could, reputational harm is a non-economic injury.

---

[16] No. 03-10-00826-CV, 2012 WL 1810215 (Tex. App.—Austin May 18, 2012) (mem. op., not designated for publication).

7

3.      Here, the evidence was legally insufficient to sustain the jury's award of $5 million.

WMT argues in its brief that corporations cannot suffer reputation damages because corporations are not people. But WMT's position has not been entirely consistent. At oral argument WMT urged that corporations can *never* suffer reputation damages, but its Response Brief concedes that corporations *may* suffer some types of reputation damages: "lost profits, rehabilitative expenses, and diminished value of the corporation—are the only damages a corporate entity's reputation can sustain." In any event, we discern WMT's contention to be that defamation per se is an inherently personal tort, and that it was designed to address harm that only natural persons may suffer, such as mental anguish, sleeplessness, or embarrassment. We have never adopted such an interpretation. On the contrary, it is well settled that corporations, like people, have reputations and may recover for harm inflicted on them.[17]

Our 1943 decision in *Bell Publishing Co. v. Garrett Engineering Co.* concerned similar facts. In that case, the corporate plaintiff, Garrett, sued an individual, Dr. Gober, and Bell Publishing Company for publishing an allegedly libelous article.[18] The events leading up to the publication involved the City of Temple's decision whether it needed a municipally owned electricity provider.[19] Garrett executed with the city a contract in which Garrett agreed to provide its engineering services

---

[17] *See* note 35, *infra; see also* RESTATEMENT (SECOND) OF TORTS § 561 (1977) ("One who publishes defamatory matter concerning a corporation is subject to liability to it . . . if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it."); *id*. § 561 cmt. b ("A corporation for profit has a business reputation and may therefore be defamed in this respect.").

[18] 170 S.W.2d 197, 199–200 (Tex. 1943).

[19] *Id.* at 200.

if the city decided to build a power plant or purchase the existing privately owned plant.[20] Garrett submitted plans and estimates to the city, held conferences with city officials, and prepared drawings of the necessary buildings and equipment.[21] The city commission then ordered a bond election to be held on financing the project.[22] In response, Dr. Gober wrote an article for the *Temple Daily Telegram*, published by defendant Bell.[23]

Dr. Gober addressed his article to the residents of Temple, and generally suggested a call to action to "thresh[] out and definitely determin[e] whether or not Temple really needs this proposed utility."[24] Dr. Gober also proposed a "sit-down strike."[25] The article also stated, "[T]here is no person connected with [Garrett Engineering] who is a practical engineer, or who holds a degree of engineering. I am reliably informed that [Garrett] has never done any similar work, and by that I mean that it has never constructed such plant for any other city."[26]

Garrett sued Gober and Bell for libel, alleging that statements in the article were false, made with malice, damaged its reputation, and injured the company financially.[27] The jury found that (1) Garrett did employ at least one person who was an engineer, (2) while Garrett had not built a

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.* at 201 (italics omitted).

[27] *Id.*

similar plant for a city, it had supervised the construction of such a plant, and (3) Garrett's damages amounted to $15,000.[28] The trial court entered judgment against both defendants based on the jury's findings.[29] On appeal, the court of appeals, while agreeing the statements were libelous and unprivileged, reversed and remanded for a new trial because the trial court failed to instruct the jury to consider only the damages that resulted from the false statements.[30]

We agreed with the court of appeals that the statements were libelous per se.[31] We considered the law of defamation: "[L]anguage which concerns a person engaged in a lawful occupation 'will be actionable, if it affects him therein in a manner that may as a necessary consequence, or does as a natural or proximate consequence, prevent him deriving therefrom that pecuniary reward which probably he might otherwise have obtained.'"[32] We held that Garrett's corporate claims for defamation per se were actionable.[33] And after examining whether Dr. Gober's statements were privileged or truthful, we upheld the jury's findings and the trial court's judgment entered against both defendants.[34]

---

[28] *Id.* at 202.

[29] *Id.*

[30] *Bell Publ'g Co. v. Garrett Eng'g Co.*, 154 S.W.2d 885, 887 (Tex. Civ. App.—Galveston 1941) *aff'd*, 170 S.W.2d at 197.

[31] *Bell Publ'g Co.*, 170 S.W.2d at 202.

[32] *Id.* (quoting *Mo. Pac. Ry. v. Richmond*, 11 S.W. 555 (Tex. 1889)).

[33] *Id.*

[34] *Id.* at 204–05. However, we also affirmed the court of appeals's judgment remanding the case to the trial court for a new trial because the trial court should have instructed the jury to award only damages for the statements that it found to be false. *Id.* at 206–207.

10

We have reaffirmed three times *Bell*'s holding that a corporation may be libeled,[35] including

just last year, and see no persuasive reason to abandon that settled precedent. Likewise, we decline

to apply our defamation jurisprudence any differently when the statements amount to per se

defamation. In such cases, "our law presumes that statements that are defamatory per se injure the

victim's reputation and entitle him to recover general damages, including damages for loss of

reputation and mental anguish."[36] If false and disparaging statements injure a corporation's

reputation, it can sue for defamation per se just like flesh-and-blood individuals.

## III. A Corporation's Reputation Damages are Non-Economic Damages
### for Purposes of the Statutory Cap on Exemplary Damages

In its sole issue, TDS argues that the trial court erred by categorizing the jury's award of

injury to reputation as non-economic damages instead of economic damages, which would result

---

[35] As noted in our prior line of cases involving corporate defamation, we distinguish between a corporation and a business—only the former may sue for defamation. *See, e.g.*, *Neely v. Wilson*, 418 S.W.3d 52, 72 (Tex. 2013) ("Our precedent makes clear that corporations may sue to recover damages resulting from defamation."); *Gen. Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 712 (Tex. 1972) ("[A] corporation, as distinguished from a business, may be libeled."); *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960) (citations omitted) ("[T]he very wording of the libel statute precludes its application to a business. It does not alter the situation that a corporation may be libeled or that a partnership may be libeled."); *Bell Publ'g Co.*, 170 S.W.2d at 203 ("[S]tatements complained of by [Garrett Engineering Co.] impute to it a lack of technical skill and practical experience on its part to perform its contract or to carry on its business and that such inescapable imputations tended to damage plaintiff's business and were actionable.").

We have noted that this type of defamation is one "of the owner of the business and not of the business itself," and that the damages are "of the owner, whether the owner be an individual, partnership or a corporation." *Matthews*, 339 S.W.2d at 893. Our most instructive piece on the distinction between the owner and the business may be found in *Matthews* in which we analyzed the two in light of the libel statute at issue in that case. There, the libel statute defined defamation as affecting "the memory of the dead," "one who is alive," "him," "any one," and "such person." *Id.* (citation omitted). Relying on our prior precedent and the Restatement, we held that while the very wording of the libel statute precluded its application to a business, it did not change the applicability to a corporation. *Id.* (citing *Bell Publ'g Co.*, 170 S.W.2d 197; RESTATEMENT OF TORTS § 561 (1938)). We further noted that the defamation specifically injures the reputation of the owner, *id.*—in other words, not the owner's business. Thus, applying our prior holdings to this case we discern the publication to be defamatory of TDS (the owner) and not the landfill-services operations (the business), and the resulting damages are those TDS suffered as the owner *of* the business.

[36] *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002).

11

in a higher allowable statutory cap on exemplary damages. TDS contends that reputation damages of a for-profit corporation are economic damages because the text of the 1995 version of the statutory cap did not specifically define non-economic damages, and because it did not expressly exclude reputation damages from the definition of economic damages. TDS says the Legislature defined economic damages as "compensatory damage for pecuniary loss," and several courts of appeals have defined pecuniary loss as "including money and everything that can be valued in money." Even *Black's Law Dictionary* defines the term as "[a] loss of money or of something having monetary value."[37] Thus, TDS concludes, a corporation's reputation damages are economic under the 1995 text, because they are (1) not specifically defined as non-economic damages, (2) not expressly excluded from the definition of economic damages, and (3) can be specifically valued in money. We disagree.

Section 41.008(b) states:

Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

> (1)  (A) two times the amount of economic damages; plus
>
> (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or
>
> (2)  $200,000.[38]

---

[37] BLACK'S LAW DICTIONARY 1030 (9th ed. 2009).

[38] TEX. CIV. PRAC. & REM. CODE § 41.008(b).

Section 41.008(b) remained unchanged as a result of a 2003 amendment.[39] Section 41.001(4) was

amended. In 1995, Section 41.001(4) read as follows:

> "Economic damages" means compensatory damages for pecuniary loss; the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society.[40]

The crux of TDS's argument is that Section 41.001 did not specifically define "non-

economic damage"—nor did it expressly exclude injury to reputation from economic damage.

In 2003, the Legislature amended Section 41.001(4) and added an entirely new subsection:

Section 41.001(4) as amended in 2003

"Economic damages" means compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages.[41]

Added 2003 subsection
"Noneconomic damages" means damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, *injury to reputation*, and all other nonpecuniary losses of any kind other than exemplary damages.[42]

TDS avers that the 2003 amendment "recharacterized reputation damages as non-economic,"

and that we should focus on what the 1995 statute intended—that a for-profit corporation's injury

---

[39] The 2003 amendment to the Civil Practice and Remedies Code is inapplicable here, given that TDS filed suit in 1997.

[40] Act of April 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (current version at TEX. CIV. PRAC. & REM. CODE § 41.001(4)).

[41] TEX. CIV. PRAC. & REM. CODE § 41.001(4).

[42] *Id.* § 41.001(12) (emphasis added).

13

to reputation must be economic because those damages are pecuniary loss and not expressly excluded by the statute's text. We decline to adopt such an interpretation.

Section 41.001(4) defines "economic damages" as "compensatory damages for pecuniary loss." Compensatory damages may be divided into two other categories: pecuniary harm and non-pecuniary harm.[43] So is injury to reputation a pecuniary loss for purposes of Section 41.001(4)? We think not.

Injury to one's person, by pain or humiliation, is not analogous to pecuniary loss.[44] Stated differently, money does not equate to peace of mind.[45] However, damages awarded for this class of injury are classified as compensatory damages.[46] So the tendency to confuse the character of the *harm* with that of the *remedy* is understandable. To be certain, compensatory damages offer a pecuniary remedy for the non-pecuniary harm that a plaintiff has suffered or will likely suffer later.[47]

Non-pecuniary harm includes damages awarded for bodily harm or emotional distress.[48] Similar to general damages, these non-pecuniary damages do not require certainty of actual monetized loss.[49] Instead, they are measured by an amount that "a reasonable person could possibly

---

[43] *See* RESTATEMENT (SECOND) OF TORTS §§ 905, 906 (1979).

[44] 1 JACOB A. STEIN, STEIN ON PERSONAL INJURY DAMAGES § 1:4 (3d ed. 2004).

[45] *Id*.

[46] *Id*.

[47] *See id*. (citations omitted).

[48] RESTATEMENT (SECOND) OF TORTS § 905 (1979).

[49] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 373 (1974) (White, J., dissenting); 2 DAN B. DOBBS, LAW OF REMEDIES § 8.1(4) (2d ed. 1993); RESTATEMENT (SECOND) OF TORTS § 621 cmt. a (1977); *id.* § 905 cmt. i (1979).

14

estimate as fair compensation."[50]  Conversely, damages for pecuniary harm do require proof of

pecuniary loss for either harm to property, harm to earning capacity, or the creation of liabilities.[51]

One leading commentator contrasts pecuniary and non-pecuniary harm this way:

> Plaintiffs prove three basic elements of recovery in personal injury actions.  (1) Time
> losses.  The plaintiff can recover loss or [sic] wages or the value of any lost time or
> earning capacity where injuries prevent work.  (2) Expenses incurred by reason of
> the injury.  These are usually medical expenses and kindred items.  (3) Pain and
> suffering in its various forms, including emotional distress and consciousness of
> loss.[52]

Professor Dobbs's first two categories concern pecuniary losses, while his third involves

non-pecuniary losses.  Applying his categorical delineations for a personal injury to this case, injury

to reputation falls into the third category as a non-pecuniary loss, because it is neither time lost nor

an expense incurred.

The Second Restatement, in defamation per se cases, also considers injury to reputation to

be a non-pecuniary harm.[53]  In cases of ordinary defamation the Restatement requires proof of

economic or pecuniary loss that reflects a loss of reputation.[54]  Said another way, the Restatement

generally requires proof of an economic loss that was occasioned by a non-economic injury like

---

[50] *See* RESTATEMENT (SECOND) OF TORTS § 905 cmt. i.

[51] *Id*. § 906.

[52] 2 DOBBS, LAW OF REMEDIES § 8.1(1) (footnotes omitted).

[53] RESTATEMENT (SECOND) OF TORTS § 905 cmt. a (1979).

[54] *Id*. § 575 cmt. b (1977).

15

slander.[55] But the Restatement takes a special position in defamation per se cases, viewing injury to reputation as a general damage, non-pecuniary harm.[56]

Finally, the draft Third Restatement also classifies injury to reputation as a non-economic harm. The draft Third defines "economic loss" as the "pecuniary damage *not* arising from injury to the plaintiff's person. . . ."[57] By negative implication, then, non-economic loss is pecuniary damage *arising from* injury to the plaintiff's person. Convincingly, the draft Third also recognizes that sometimes an economic loss will actually be considered a personal injury if emotional harm is involved that causes pecuniary loss:

> Wrongs that might seem to cause only economic loss are sometimes regarded otherwise because the law takes an expansive view of what counts as a personal injury. Defamation, for example, is regarded as inflicting a kind of personal injury: harm to the plaintiff's reputation. If a defendant inflicts emotional harm on the plaintiff, and causes the plaintiff to suffer consequent pecuniary loss, it is likewise a case of personal injury covered not here but in Restatement Third, Torts: Liability for Physical and Emotional Harm.[58]

---

[55] *See id.*

[56] *Id.* § 905 cmt. a (1979).

[57] RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 2 (Tentative Draft No. 1, 2012) (emphasis added).
     Sections 1 through 5 of the draft Restatement Third were approved by the membership of the American Law Institute at the 2012 Annual Meeting, subject to the discussion at the Meeting and to editorial prerogative. *Proceedings at 89th Annual Meeting: American Law Institute*, 89 A.L.I. PROC. 22–47 (2012). According to the Institute: "Once it is approved by the membership at an Annual Meeting, a Tentative Draft or a Proposed Final Draft represents the most current statement of the American Law Institute's position on the subject and may be cited in opinions or briefs . . . until the official text is published." *Overview, Project Development*, THE AMERICAN LAW INSTITUTE, http://www.ali.org/index.cfm?fuseaction=projects.main (last visited April 25, 2014). Section 2 of the draft Third is consistent with our analysis today.

[58] RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM § 2 cmt. a (Tentative Draft No. 1, 2012).

According to the draft Third, if harm to one's reputation is "a kind of personal injury," it may not be considered an economic loss "because the law takes an expansive view of what counts as a personal injury."[59]

Thus, both the Restatements and commentators recognize the distinction between the non-pecuniary injury and the pecuniary remedy.

Our cases likewise treat an individual's reputation damages as non-economic.[60] In *Bentley v. Bunton*, a local district judge brought a defamation action against a host and co-host of a call-in talk show televised on a public-access television channel.[61] For months, the host of the show had accused the local judge of being corrupt.[62] The trial court rendered judgment in favor of the judge, finding that the host's statements were conclusively proven to be false and defamatory.[63] The jury awarded $7 million to the judge for mental anguish damages.[64] The court of appeals affirmed the judgment against the host but reversed the judgment against the co-host.[65] We granted both parties' petitions for review. Importantly, we noted that mental anguish damages and reputation damages, such as those in *Bentley*, were non-economic damages.[66]

---

[59] *See id.*

[60] *Bentley*, 94 S.W.3d at 605.

[61] *Id.* at 566–67.

[62] *Id.*

[63] *Id.* at 567.

[64] *Id.* at 576.

[65] *Id.* at 577.

[66] *Id.* at 605.

17

Though the plaintiff in *Bentley* was an individual, our conclusion focused on the nature of the damage suffered, not on whether the plaintiff was an individual or a corporation. We did not strictly cabin our opinion to an individual's reputation damages. We said generally: "*Non-economic damages like these* [mental anguish, character, and reputation damages] cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment."[67]

Just last year, we reaffirmed that an individual's reputation damages are non-economic damages in *Hancock v. Variyam*.[68] In that case, Variyam was the Chief of the Gastroenterology Division of the Texas Tech University Health Sciences Center (the "Division").[69] Hancock worked as an associate professor under Variyam's supervision.[70] After a dispute arose between the two about Hancock's care of patients, Hancock sent a letter to the Chair of the Division, the Dean of the School of Medicine, a Division colleague, and the entity reviewing the Division's application for accreditation for its gastroenterology fellowship.[71] Hancock wrote that Variyam had a "reputation for lack of veracity" and "deals in half truths, which legally is the same as a lie."[72] Subsequently,

---

[67] *Id*. (emphasis added).

[68] 400 S.W.3d at 65.

[69] *Id*. at 62.

[70] *Id*.

[71] *Id*.

[72] *Id*. at 62–63.

18

the Division's fellowship was not accredited and the Chair of the Department removed Variyam as Chief of the Division.[73]   Variyam sued Hancock for defamation.[74]

Regarding damages, we held: "Actual or compensatory damages are intended to compensate a plaintiff for the injury she incurred and include general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special damages (which are economic damages such as for lost income)."[75]

Our decisions in business disparagement cases bolster our conclusion here.

We have previously noted the distinction between business disparagement and defamation cases.  To recover for business disparagement "a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in *special damages* to the plaintiff."[76]  In *Forbes*, we noted the similarity between the two claims, but that one difference is that one claim seeks to protect reputation interests and the other seeks to protect economic interests against pecuniary loss.[77]  That is, a plaintiff seeking damages for business disparagement must prove special damages resulting from the harm;[78] to hold otherwise

---

[73] *Id*. at 63.

[74] *Id*.

[75] *Id*. at 65.

[76] *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (citing *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987)) (emphasis added).

[77] *Id.*

[78] *Id.*

19

would subvert a fundamental element of the tort. In contrast, in a defamation case a plaintiff may recover for both general and special damages.[79]

As we explained in *Hancock*, and reaffirm today, general damages in defamation cases "are non-economic damages such as for loss of reputation" while special damages "are economic damages such as for lost income."[80] These delineations remain constant, too, for business disparagement—a tort that seeks to protect the economic interests and which expressly requires a showing of special damages. To a certain extent, then, a defamation claim allows a plaintiff to recover that which would not be recoverable under business disparagement—namely, for a non-economic injury such as injury to reputation—because disparagement only seeks to protect the plaintiff's economic interests while defamation seeks to protect the plaintiff's reputation.[81]

* * *

We see no sound basis to depart from our settled precedent treating reputation damages as non-economic damages. Thus, in line with our prior decisions, and the consensus of the Restatement and other commentators on the nature of reputation damages, we hold that, for purposes of the previous version of Section 41.001(4),[82] damages for injury to reputation are non-economic damages. Therefore, the trial court did not err when it calculated the statutory cap on exemplary

---

[79] *See Hancock*, 400 S.W.3d at 65–66.

[80] *Id.* at 65.

[81] We note that in situations such as this one, a corporate plaintiff may recover under either a business disparagement or defamation claim—being limited only to economic damages under the former, but having no such limitation under the latter, assuming all other elements are satisfied.

[82] Because the amended version of the statute expressly defines reputation damages as non-economic damages, this specific issue will not likely arise in the future.

20

damages by classifying TDS's reputation damages as non-economic damages. However, for reasons discussed below, we reverse the jury's award of $5 million for reputation damages because the evidence is legally insufficient to support such an award, without evidence of actual damages to TDS's reputation.

## IV. The Evidence Was Legally Sufficient to Support the Award of Remediation Costs, But Not the Award of Reputation Damages

WMT contends that the evidence was legally insufficient to support the jury's award to TDS of $5 million in reputation damages, $450,592.03 in remediation costs, and $20 million in exemplary damages.

A party will prevail on its legal-sufficiency challenge of the evidence supporting an adverse finding on an issue for which the opposing party bears the burden of proof if there is a complete absence of evidence of a vital fact or if the evidence offered to prove a vital fact is no more than a scintilla.[83] More than a scintilla exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions.[84] However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence.[85]

In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered

---

[83] *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

[84] *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

[85] *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

21

favorable and disregarding unfavorable evidence unless the reasonable fact finder could not.[86] We

indulge every reasonable inference that supports the trial court's findings.[87]

In *Gertz v. Robert Welch, Inc.*, the United States Supreme Court held that the First

Amendment restricts the damages that a private individual can obtain from a media defendant for

defamation that involves a matter of public concern.[88] Specifically, the Supreme Court held that,

unless the plaintiff shows actual malice (*i.e.*, knowledge of falsity or reckless disregard for the truth),

the First Amendment prohibits awards of presumed and punitive damages for defamatory

statements.[89] The Supreme Court has continued to follow this reasoning for private plaintiffs.[90] But

the Supreme Court has left open the question of whether presumed or punitive damages are

constitutional when there is actual malice and presumably no proof of actual harm in cases such as

*Gertz*.[91] That isn't to say that the Supreme Court would completely disallow presumed damages,

as the Restatement notes: "In case the Court should hold that nominal damages cannot be recovered

---

[86] *City of Keller*, 168 S.W.3d at 807.

[87] *Id*. at 822.

[88] 418 U.S. at 350.

[89] *See id*. at 349.

[90] *See, e.g.*, *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310–11 (1986) ("[S]ome form of presumed damages may possibly be appropriate [when an injury is likely to have occurred but is difficult to establish]."); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774 (1986) ("[T]he state interest [in preserving private reputation] adequately supports awards of presumed and punitive damages—even absent a showing of actual malice.") (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985)) (quotations omitted and second brackets supplied)).

[91] RESTATEMENT (SECOND) OF TORTS § 620 cmt. c (1977).

22

in the absence of proof of actual harm, it seems most likely that the restriction will not be held to apply when the defendant had knowledge of the falsity or acted in reckless disregard of it."[92]

## A. Actual Malice

As a public figure, TDS was required to prove that WMT published the Action Alert with actual malice.[93] A statement is published with actual malice if it is made with "knowledge of, or reckless disregard for, the falsity" of the statement.[94] Such statements are not constitutionally protected.[95] To determine whether a statement is made with knowledge of, or reckless disregard for, the falsity, we must consider the factual record in full.[96]

WMT raises several points against the jury's actual malice finding. It contends that (1) the record shows TDS failed to establish the Action Alert's authors' subjective states of mind regarding their reckless disregard for the falsity; (2) the technical, jargon-filled statements, without an explanation of their meaning, cannot be reasonably understood, and thus cannot form a basis for actual malice; and (3) ambiguous semantical differences in the language cannot form a basis for actual malice.[97]

---

[92] *Id.*

[93] The parties do not challenge the trial court's determination that TDS is a public figure and the issue is one of public concern.

[94] *Bentley*, 94 S.W.3d at 591.

[95] *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).

[96] *Bentley*, 94 S.W.3d at 591.

[97] WMT also argues that the trial court erroneously excluded evidence based on hearsay grounds that WMT asserts would have shown that it was not acting with actual malice; instead, it argues, the evidence would have shown that the statements in the Action Alert were reports of views held by others. We disagree. We review a trial court's

First, WMT argues that TDS did not carry its burden in establishing by clear and convincing evidence that the Action Alert's authors, Don Martin and Al Erwin, "entertained serious doubts as to the truth" of the publication—thereby revealing their reckless disregard for the truth.[98] WMT alleges that "[o]ther than the direct testimony of Martin and Erwin . . . there was no evidence regarding Martin's or Erwin's state of mind at the time of the Action Alert." But WMT's argument inaccurately presents the issue by not giving credit to the first prong of the actual-malice test: whether Martin had actual knowledge of the falsity. Martin's own testimony conclusively established that he was aware of the falsity. Specifically, Martin testified that he knew TDS's landfill complied with the Environmental Protection Agency rules, and that he knew it would be false to say otherwise. Martin stated that he intended for readers to think that TDS had a "loophole" around such environmental rules. Martin also said that he wanted readers to think TDS's landfill was less environmentally safe. In addition, WMT officials involved with Martin had the same understanding of both the text of the Alert and the falsity it carried with it. Thus, we think the record contains legally sufficient evidence that Martin and WMT published the Action Alert with knowledge of the falsity. Consequently, we need not consider the alternative basis for actual malice,

---

exclusion of evidence for abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). The trial court determined that the evidence was expert-opinion evidence not subject to the public record exception of the hearsay rule, TEX. R. EVID. 803(8)(A). Because the trial court, at the time, had limited knowledge of the qualifications of the authors of the opinion testimony, and had limited knowledge of the reliability of such testimony, we cannot say that it abused its discretion by excluding the evidence. Even assuming the exclusion was in error, it was harmless because the testimony excluded was in some form effectively obtained from other sources. WMT thus does not show that the exclusion of evidence probably resulted in the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). We therefore agree with the court of appeals that the trial court did not reversibly err by excluding the evidence.

[98] *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

24

as WMT advances, which questions whether Martin or WMT acted in reckless disregard of the falsity.[99]

Second, WMT contends that the technical, jargon-filled statements in the Alert cannot form a basis to establish actual malice. WMT cites two cases in support of its argument.[100] But neither of these cases rise to the level of responsibility here. Under these facts, Martin and WMT knew of the falsity of the Alert. Both knew that claiming that TDS's landfill had received an exception to EPA rules was false. Both knew that the language in the Alert was not simply inaccurate or made in error; instead, both parties knew it to be incorrect and specifically drafted the language to prevent TDS from obtaining the Starcrest station contract. Thus, the statements in this case are not the type that represent "the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies."[101] The statements here—concerning whether TDS's landfill had received an "exception" to EPA rules, or whether TDS accepted hazardous waste—require no technical expertise, and are not simply inaccurate or easily misunderstood; there was evidence they were specifically made to mislead and injure TDS's reputation.

Finally, WMT asserts that ambiguous semantical differences in the language cannot form a basis for actual malice. Principally, WMT argues that the Alert's use of the word "exception" over "alternative" is legally insufficient to support an actual-malice finding. WMT relies on *Time, Inc.*

---

[99] Actual malice exists where a statement is made with "knowledge of, *or* reckless disregard for, the falsity." *Bentley*, 94 S.W.3d at 591 (emphasis added).

[100] *Bose Corp. v. Consumer's Union of United States, Inc.*, 466 U.S. 485 (1984); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556 (5th Cir. 1997).

[101] *Bose Corp.*, 466 U.S. at 513.

25

*v. Pape*, contending that the Alert is subject to a "number of possible rational interpretations," which does not create a fact issue on malice for the jury to decide.[102] We disagree. This is not a case of "an understandable misinterpretation of ambiguous facts."[103] Martin and WMT specifically chose the language and drafted the Alert to have negative effects on TDS's business. Martin engineered the Alert's language to influence the reader into thinking that TDS's landfill was operating under an exception to EPA rules and that it was less environmentally safe compared to other area landfills.

We think the evidence is legally sufficient on the issue of whether WMT published the Alert with knowledge of the falsities it contained. We now turn to the sufficiency of the evidence to support the damages awarded by the jury based on its finding of actual malice.

### B. Damages

The damages issue is one of constitutional dimension. In *Gertz*, the Supreme Court cautioned that "[t]he largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms."[104] Referring to presumed damages in defamation per se cases, the Court held that state law may set a lesser standard of culpability than actual malice for holding a media defendant liable for defamation of a private plaintiff.[105] The Court

---

[102] 401 U.S. 279, 290 (1971).

[103] *Bentley*, 94 S.W.3d at 596.

[104] 418 U.S. at 349.

[105] *Id*. at 349–50.

26

noted, however, that under any lesser standard a plaintiff can recover "only such damages as are sufficient to compensate him for actual injury."[106]

Although the Court's analysis only considered such damages where the defendant was *not* shown to have acted with actual malice,[107] unlike the case here, we extended the Court's reasoning in *Gertz* and applied it to cases in which the defendant *was* found to have acted with actual malice. Such was the case in *Bentley v. Bunton*, which involved an award of non-economic damages.[108] We held that the First Amendment requires appellate review of non-economic damage awards, because any recovery should only compensate the plaintiff for actual injuries and not be a disguised disapproval of the defendant.[109] *Bentley* stated: "Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish."[110] Even while recognizing that non-economic damages cannot, by their nature, be determined with mathematical precision and that juries must "have some latitude in awarding such damages,"[111] we were equally clear that such damages are not immune from no-evidence review on appeal. We held that the evidence must be

---

[106] *Id.* at 350.

[107] *Cf. id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 620 cmt. c (1977) (quoting *Gertz*, 418 U.S. at 349) ("[I]t is possible that the Court will hold that the Constitution requires proof of actual harm as a necessary requisite for the existence of any liability for defamation, 'at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.'").

[108] *See* 94 S.W.3d at 576.

[109] *Id.* at 605.

[110] *Id.* at 604.

[111] *Id.* at 605.

27

legally sufficient as to both the existence and the *amount* of such damages, that "[j]uries cannot simply pick a number and put it in the blank," and that instead the amount must fairly and reasonably compensate the plaintiff for his injury.[112] We held under this standard that there was no evidence to support the $7 million in mental anguish damages awarded by the jury, because this amount was excessive, unreasonable, and "far beyond any figure the evidence can support."[113]

In today's case, we must determine whether there was any evidence to support the jury's award in favor of TDS for $450,592.03 in remediation costs and $5 million in reputation damages, and $20 million in exemplary damages, which the trial court statutorily reduced to $1,651,184.06. We hold that the evidence is sufficient to support the award of remediation costs and exemplary damages, but there is no evidence to support the amount awarded for reputation damages.

### 1. Reputation Damages

The extent of TDS's evidence of injury to its reputation was the testimony of its chief executive officer, Bob Gregory, who testified that TDS's reputation was "priceless." Gregory later estimated that the value of TDS's reputation was in the range of $10 million. At oral argument, when asked what evidence would quantify TDS's reputation damages, TDS directed us to three separate exhibits in the record that it contended support the $10 million figure. We can find no relationship between the exhibits and the $10 million estimation.

---

[112] *Id.* at 606 (quoting *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)).

[113] *Id.* at 607.

The first exhibit cited by TDS contains 271 pages of invoices for consulting and attorney expenses, carrying costs and depreciation expenses on equipment,[114] "estimated profits," value of time spent, supplies, mileage expenses, and the like. In other words, the first exhibit refers to no evidence quantifying TDS's injury to its reputation. Even Mr. Gregory conceded in his deposition that the first exhibit is a summary of his calculations of "lost profits . . . and additional expenses caused by the Action Alert." These special damages, however, are not the sort of general damages that necessarily flow from such a defamatory publication.[115] TDS in fact asked for separate damages for its lost profits and certain expenses in jury question five, in addition to general damages for loss of reputation in question 7. The jury found no lost profits that might correspond to actual loss of reputation going forward.

The second and third exhibits are similarly uninstructive. They concern only the alleged decrease in TDS's "base business"—TDS's business irrespective of the Austin and San Antonio contracts. But none of these exhibits evidences any actual injury to TDS's reputation either; instead, they only depict comparisons of the growth (or decline) of local landfill service businesses. They do not reveal any quantity of damages to TDS's reputation. Indeed, TDS conceded at oral argument that these figures are only "indicators . . . that give credence to Mr. Gregory's estimates." We cannot agree with TDS's position that these exhibits quantify any amount of reputation damages. The evidence must support the amount awarded by the jury; it must not be an "indicator" that

---

[114] The equipment at issue involved equipment purchased to operate the Starcrest station. TDS was unable to use the equipment at the station because of a delay, so it capitalized its carrying costs and depreciation costs.

[115] *Cf. Gertz*, 418 U.S. at 373 (White, J., dissenting); 2 DOBBS, LAW OF REMEDIES § 7.2(3); RESTATEMENT (SECOND) OF TORTS § 621 cmt. a (1977).

29

supports the estimates offered by the corporate executive. Without any supporting evidence of actual damages for injury to its reputation, TDS is entitled only to nominal damages in accordance with our decisions on presumed damages in defamation per se cases.[116]

We recognize that assessing injury to reputation is an inexact measurement, but the jury is not unconstrained in its discretion.[117] Awards must both be fair and compensate the plaintiff for the injury, and must not amount to "disguised disapproval of the defendant."[118]

Here, we cannot say that the amount awarded by the jury any more fairly and reasonably compensates TDS for its injury to reputation than it appears to be disapproval of WMT's conduct. There was no evidence that $5 million would reasonably and fairly compensate TDS for damage to its reputation, and we accordingly hold that this award cannot be sustained.

## 2. Remediation Costs

WMT also challenges the sufficiency of the evidence of TDS's remediation costs. Specifically, WMT contends that TDS cannot show that the Alert caused TDS's remediation costs. On the contrary, TDS's evidence of damages consisted of 271 pages of invoices, expenses, time spent on curative work, supplies, mileage, etc. This type of evidence does not support the award for reputation damages, as we discussed above, but it does provide some evidence of the remediation costs TDS incurred as a result of the Alert. TDS's witnesses, including its chief executive officer,

---

[116] *See, e.g.*, *Hancock*, 400 S.W.3d at 65.

[117] *See Saenz*, 925 S.W.2d at 614.

[118] *See Bentley*, 94 S.W.3d at 605.

30

Bob Gregory, testified that TDS's staff devoted more than $700,000-worth of time[119] and $450,592.03 in out-of-pocket expenses to remedy the Alert's effects.

Although the Alert failed in its purpose to compensably tarnish TDS's image, its publication and the resulting fallout still caused TDS to incur out-of-pocket consultant expenses—expenses that would not have been incurred but for the Alert—which are detailed by the invoices submitted by the consultants. These are exactly the type of special damages one would incur in remedying the effects of a publication similar to the one present here. Therefore, we hold that evidence is sufficient to support the jury's award of remediation costs and affirm that portion of the verdict.

### 3. Exemplary Damages and Pre- and Post-Judgment Interest

Because the evidence was sufficient to support the jury's finding of actual malice and because TDS established actual damages for its remediation costs, TDS is entitled to exemplary damages.[120] We note, however, that because the evidence was insufficient to support part of the actual damages awarded by the jury, the calculation of exemplary damages allowable by statute is necessarily affected.[121] Accordingly, we reverse the court of appeals' judgment affirming the exemplary damages awarded by the trial court and remand the case to the court of appeals for it to reconsider the amount of exemplary damages.

---

[119] WMT also challenges this aspect of TDS's evidence of remediation costs, but the jury only awarded TDS its actual, out-of-pocket expenses, to the penny. Because the jury could have reasonably disregarded TDS's evidence of staff time spent managing the effects of the Alert, so shall we. *See City of Keller*, 168 S.W.3d at 811. We therefore limit our discussion to the amount awarded by the jury.

[120] *See Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993) (per curiam) ("Recovery of punitive damages requires a finding of an independent tort with accompanying actual damages."); TEX. CIV. PRAC. & REM. CODE § 41.004(a).

[121] *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b).

31

We now turn to the trial court's award of both pre- and post-judgment interest. Because we determine here that the amount of the final judgment rendered by the trial court is not supported by the evidence, we also remand this case to the court of appeals for it to revisit the issue of judgment interest. One might think the recalculation is relatively straightforward, but more is involved. The answer becomes more complicated where, as here, the trial court awarded both pre- and post-judgment interest—both of which are affected by the amount of the final judgment. Another important factor comes into play and asks whether, on appeal, TDS moved for and was granted any extensions of time, because judgment interest does not accrue for the period of any extension.[122] Because our decision today necessitates a review and recalculation of the allowable exemplary damages and pre- and post-judgment interest amounts, we remand to the court of appeals and instruct it to either recalculate the respective amounts or, if necessary, remand to the trial court for further proceedings consistent with this opinion.

## V. Conclusion

Summing up:

- A for-profit corporation may recover for injury to its reputation.

- Such recovery is a non-economic injury for purposes of the statutory cap on exemplary damages in the pre-2003 version of the Civil Practice and Remedies Code.

- The evidence here was legally insufficient to support the award of reputation damages, but the evidence *was* sufficient to support the award of remediation costs and thereby exemplary damages.

---

[122] TEX. FIN. CODE § 304.005(b) (Post-judgment interest does not accrue "[i]f a case is appealed and a motion for extension of time to file a brief is granted for a party who was a claimant at trial . . . .").

32

Accordingly, we affirm in part and reverse in part the court of appeals' judgment. TDS is entitled to actual damages of $450,592.03 for its remediation costs, and nominal damages for injury to its reputation. Moreover, because the jury's finding of actual malice is amply supported by the evidence and because TDS submitted sufficient evidence of actual damages, TDS is entitled to exemplary damages. We remand to the court of appeals for it to reconsider the amount of exemplary damages and pre- and post-judgment interest awards in light of this decision.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** May 9, 2014