# IN THE SUPREME COURT OF TEXAS

════════════
No. 15-0056
════════════

WADE BRADY, PETITIONER,

v.

LEAANNE KLENTZMAN AND CARTER PUBLICATIONS, INC. D/B/A THE WEST FORT
BEND STAR, INC., RESPONDENTS

═══════════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════════

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GREEN, JUSTICE WILLETT, and JUSTICE BROWN joined.

The jury awarded Wade Brady $30,000 for past injury to his reputation and $20,000 for past mental anguish. There is no evidence to support either amount, and the Court's contrary view would be troubling in any case. But this is not any case. This is a suit against media defendants for public speech. Recently, in *Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Inc.*, a defamation case against a private party, we explained:

> The damages issue is one of constitutional dimension. In *Gertz* [*v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)], the Supreme Court cautioned that "[t]he largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms."

. . . We held [in *Bentley v. Bunton*] that the First Amendment requires appellate review of non-economic damage awards, because any recovery should only compensate the plaintiff for actual injuries and not be a disguised disapproval of the defendant. *Bentley* stated: "Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish." Even while recognizing that noneconomic damages cannot, by their nature, be determined with mathematical precision and that juries must "have some latitude in awarding such damages," we were equally clear that such damages are not immune from no-evidence review on appeal. We held that the evidence must be legally sufficient as to both the existence and the *amount* of such damages, that "[j]uries cannot simply pick a number and put it in the blank," and that instead the amount must fairly and reasonably compensate the plaintiff for his injury.[1]

Here is all the evidence in the record regarding any injury to Wade's reputation.

- Wade's father testified:

> Q    Now, have you located any people in the community that had a negative impression of Wade after this article?
>
> A    Yes.
>
> *        *        *
>
> Q    Okay. So did you come to find out that there was at least one person that thought poorly of Wade after this article?
>
> A    Yes.
>
> *        *        *
>
> Q    Okay. Tell me about that.
>
> A    There was an individual by the name of Clarence Mercer. He was an older gentleman who lives in Richmond.

---

[1] 434 S.W.3d 142, 159–160 (2014) (emphasis in the original) (footnotes omitted) (citing and quoting *Bentley v. Bunton*, 94 S.W.3d 561, 604–607 (2002)).

2

Q       Did you know him?

A       No. I had never met him.

•       Sheriff Wright testified that Wade worked at Speedway Shirts & Signs, an advertising and printing business owned by Caleb and Kelly Burke, that had a contract to put department decals on its patrol cars. Wright testified:

Q       And did you receive a call from the owners of Speedway Shirts & Signs within a day or so of when this article appeared in the paper?

A       I did receive a call from Caleb Burke. I cannot give you the time.

Q       Okay. Was it after this article?

A       Yes.

Q       And [] you may not be able to give me a precise time, but was it relatively close to the time that this article came up?

A       Yes, it was close.

Q       So days, maybe a week, but certainly not months. Would you agree with that?

A       No. I would say days.

*       *       *

Q       Okay. Without telling me what the Burkes told you, did you meet with the Burkes because of their invitation, or did you call the Burkes to meet with them?

A       I met at their invitation.

*       *       *

Q       Based on your observation, were the Burkes concerned?

A       They were concerned.

3

Q       Did the concern, based on your observation of them, have something to do with this article?

*       *       *

A       They did—they were concerned.

Q       About this article?

A       Exactly.

Q       And the Burkes had a contract with the county at the time, correct?

A       That's correct.

Q       And this kid, who is so unruly and intoxicated, worked for them?

A       That's correct.

Q       Okay. And [] sometime that day, was Wade asked to resign?

A       I'm not sure. I don't know about that.

Q       Well, let me ask it this way: Did Wade resign that day?

A       I think—I don't know if he resigned that day or not; but I think, ultimately, he did resign. But I'm not sure about the date.

Q       Okay. Did Mr. Brady have another job lined up when he was asked to resign? Do you know?

A       I don't know.

*       *       *

Q       Okay. After you spoke with—did you tell the Burkes not to worry, their contract was safe?

A       I did tell them that, yes.

4

Q       Okay. Did you tell the Burkes, "Even if you appear in the paper for employing this kid, [] your contract is safe"? Did you say anything like that?

A       Pretty much what I said.

Q       Okay. And did Mr. Brady—did he end up resigning sometime after that?

A       Yes.

- And Wade testified:

Q       Do you know that other people were talking about the article?

A       Yes.

Q       How did you find that out?

A       Well, I guess the first time that I really found out about it was when my boss asked me to quit my job.

Q       Okay. Eventually you came back to work for that company, right?

A       Yes.

Q       Okay. What about your friends?

A       My friends talked about it. They knew it wasn't true because they know me.

*       *       *

Q       Let me ask you this question: Did your friends tell you anything that led you to believe that it was affecting your reputation?

A       Yes.

> Q      Okay. And without getting to the specific substance of what the conversations were by other people, what did your friends tell you, in general?
>
> A      The article makes me look like a criminal and my dad gets me out of trouble.

That is absolutely all the evidence there is.

Wade's father did not testify that anyone in the community had a negative impression of Wade *because of* the article. He stated only that an older gentleman he had never met thought poorly of Wade *after* the article. *Post hoc* is not *propter hoc*. Wright testified that Wade's employer was concerned that the article might affect its contract with the sheriff's department, but he assured them it would not. Wright did not know when or why Wade resigned from his job there, or whether his resignation was related to his employer's concerns. Wade himself did not testify that he was asked to quit his job *because of* the article. And in fact, Wade testified that he returned to work with the same employer. Neither Wade, nor his father, nor anyone else testified that Wade's reputation was damaged on account of the article. One cannot fairly infer that Wade's reputation was injured at all, let alone on account of the article. If anything, even assuming that the article was related to Wade's being asked to quit his job, he returned to the same job, indicating that his reputation was not injured. This was no evidence that Wade's reputation suffered in any way, and certainly no evidence of an injury for which $30,000 would be reasonable compensation.

Here is all the evidence in the record regarding Wade's mental anguish. Wade's parents testified that Wade has "always been very quiet", an "introvert" who "just sort of stays to himself" and "doesn't talk much". His mother testified that the article "bothered him a lot, he was withdrawn, stayed to himself, stayed around the house, put on weight, and had some weird dreams;" "he seemed

depressed and withdrawn." His father testified that he "started spending more time in his room, just wouldn't talk, and [was] somewhat antisocial." And here is the total of Wade's testimony:

> Q     Now, when I asked you [at your deposition] in 2004 if you remember anything that caused you mental anguish, you said, "Not at this time. I need more time to think about it." Do you recall that?

> A     Yes.

> Q     This is a year and a half after the article, you needed more time to think about what was causing your mental anguish?

> A     Yes. This article actually affected me until about five years ago, and I could really look back on it.

> Q     Okay. You haven't seen any psychologist, doctor, counselor, or anything about mental anguish?

> A     No.

> Q     So would it be fair to say it has not substantially interrupted your daily routine?

> A     That's not true.

> Q     You believe it has?

> A     Yes.

> Q     But you still haven't gone to see anybody about it?

> A     No. It doesn't really affect me anymore, not like it did.

> Q     Well, if somebody could have helped you, don't you think it was your obligation to go out and try to mitigate these damages?

> A     Well, I just—I'm not the kind of person to do that.

Q    Okay.

A    I would rather stay to myself.

Q    All right. So you didn't do anything to try to help the situation?

A    No. I hid.

Again, that is absolutely all the evidence there is. There was no testimony regarding Wade's daily routine, whether or how it was affected, or whether or how any disruption related to the article.

In *Service Corp. International v. Guerra*, we stated:

> Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress.[2]

There is no such evidence in this record. To the contrary, the evidence is that Wade, shy and introverted before the article, was shy and introverted after the article.

If this were a slip-and-fall case, there would be no evidence of compensable mental anguish. But it is not. This case necessarily involves the media defendants' exercise of First Amendment rights. Juries in defamation cases are not charged with protecting those rights in awarding damages. That responsibility belongs to the courts reviewing the evidence to support jury findings. The Court notes, but does not take seriously, that responsibility in this case.

---

[2] 348 S.W.3d 221, 231 (Tex. 2011).

As the Court acknowledges, Wade does not argue that the article was defamatory per se, entitling him to nominal damages. The media defendants are entitled to rendition of judgment in their favor. Because the Court disagrees, I respectfully dissent.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: January 27, 2017