**Opinion on Rehearing issued July 25, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00118-CV

———————————

**MCDONALD OILFIELD OPERATIONS, LLC, Appellant**

**V.**

**3B INSPECTION, LLC, ROBERT BEALL, CHRIS MYRAND, KYLE GRANT, PATRICK BAGE, AND DYLAN ROGGE, Appellees**

On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Case No. 17-DCV-247216

## OPINION ON REHEARING

Appellees—3B Inspection, LLC and its principal Robert Beall (collectively, 3B Inspection), and individual employees of 3B Inspection: Chris Myrand, Kyle Grant, Patrick Bage, and Dylan Rogge (collectively, individual employees)—filed suit against appellant, McDonald Oilfield Operations, LLC. McDonald Oilfield

moved to dismiss the suit pursuant to the Texas Citizens Participation Act (TCPA), and the trial court denied the motion. In three issues, McDonald Oilfield argues that it successfully demonstrated that the TCPA applies here because 3B Inspection and the individual employees filed this lawsuit in response to its exercise of its right to petition, or, alternatively, that the lawsuit was based on, related to, or was filed in response to its speech on matters of public concern. McDonald Oilfield also argues that 3B Inspection and the individual employees failed to present clear and specific evidence on each essential element of their claims.

A panel of this Court issued an opinion on December 6, 2018, and McDonald Oilfield subsequently moved for rehearing of the case. We granted the motion. We now withdraw our opinion and judgment issued on December 6, 2018, and issue the following opinion and judgment in their place. We reverse and remand.

## Background

3B Inspection and McDonald Oilfield are competitors in the pipeline monitoring business. Since 2008, McDonald Oilfield has used "pipeline pigs," which perform pipeline monitoring and maintenance operations without having to stop the flow of product within the pipeline, and other equipment to perform external pipeline monitoring and to maintain pipeline integrity.

The individual employees—Myrand, Grant, Bage, and Rogge—worked for McDonald Oilfield as independent contractors. Under standards set by the federal government, McDonald Oilfield sponsored and maintained "Operator Qualifications" demonstrating that the individual employees were properly trained to perform pipeline monitoring tasks. In the declaration of McDonald Oilfield's office manager, Latischia McDonald, the company provided further information regarding Operator Qualifications:

> Due to the type of work McDonald Oilfield specializes in, McDonald Oilfield must maintain Operator Qualifications for the individuals who perform work for it. Operator Qualifications are an industry standard imposed by federal law and the U.S. Department of Transportation, and having those qualifications are required for those workers to perform work on pipelines. To receive Operator Qualifications, pipeline workers receive training and subsequent evaluations in order to determine whether he or she is qualified. Once qualified, the Operator Qualification, which is sponsored by the employer, is filed in a database that the United States Department of Transportation or other operator companies can review to determine if a pipeline has workers with Operator Qualifications. The database we use is called Verisource which is itself an Operator Qualification compliance company. McDonald Oilfield paid for [the individual employees] to receive their Operator Qualifications and McDonald Oilfield sponsored the Operator Qualifications. Operator companies and the United States Department of Transportation can search Verisource, or other databases maintained by other compliance companies, to verify that workers possess the necessary Operator Qualifications to perform the agreed upon scope of work.

In addition to maintaining Operator Qualifications for its pipeline workers, McDonald Oilfield required background checks and drug testing, and it made internal policies and procedures to ensure that its operators were properly trained

3

and qualified to perform their duties. McDonald Oilfield stated, through Latischia McDonald's declaration, that this was important for several reasons:

> [I]f [McDonald Oilfield] does not follow these policies and procedures, there can be catastrophic and deadly accidents out in the field. For example, if a line locater is not correctly calibrated by an experienced and trained user, a pipeline that contains oil, gas, natural gas, or other hazardous substances, may be marked incorrectly. If a pipeline carrying such hazardous substances at high pressure is marked incorrectly by an improperly calibrated line locator and is then hit by construction equipment, a massive explosion, including the loss of life and release of environmental contaminants, can occur.

Latischia McDonald further declared that "[p]ipeline pigging can also be very dangerous if not performed properly by qualified workers and with proper equipment" because

> when launching a pig into the pipeline, it is sometimes pushed with nitrogen or the same substance that is being transported through the pipeline. This means the pressure of the pipeline must be known and could require valves on the pipeline to have to be turned in order to steer the pig in the correct direction. One must have an Operator Qualification to turn those valves. If a valve is not turned correctly and the pig goes in the wrong direction or into a valve, it could shut the entire pipeline down. Also, if the valves are not turned correctly, it can cause the substance the pipelines are carrying to mix. When certain substances mix, there is also the potential for a deadly explosion and release of environmental contaminants.

In 2016, Robert Beall—who had many years of experience within the oil and gas industry—formed 3B Inspection. Beall is the principal of 3B Inspection, and his associate, Greg Simko, is the "Co-President" of 3B Inspection. 3B Inspection hired Myrand, Grant, Bage, and Rogge in August 2017.

4

According to Latischia McDonald's declaration, McDonald Oilfield was not initially aware that the individual employees had begun working for 3B Inspection. Rather, Latischia McDonald believed that Myrand was out of town visiting family. McDonald Oilfield asserted that it did not learn that Myrand and the other individual employees had become employees of 3B Inspection until the end of September 2017. McDonald Oilfield asserted that, despite the change in employers, the individual employees nevertheless continued using McDonald Oilfield's equipment and accessing McDonald Oilfield's proprietary software and databases.

Upon learning of the change in employers, McDonald Oilfield contacted the individual employees—its former contractors—"to remind them of their confidentiality obligations." Specifically, on October 1, 2017, Latischia McDonald texted Myrand, stating, "Hey Chris. This is just a follow up from my voicemail to remind you that any equipment belonging to McDonald Oilfield Operations or Otis & Sons must be returned today or theft of property charges will be filed." The text message also asked Myrand to "refrain from speaking ill about McDonald Oilfield Operations" and informed him that false statements he had made could result in McDonald Oilfield's being able to file defamation claims against him. Latischia McDonald also declared that she had verbally relayed the same message to the other three individual employees on the same day.

5

On October 2, 2017, McDonald Oilfield suspended the Operator Qualifications it was sponsoring for the individual employees. Latischia McDonald declared:

> While McDonald Oilfield can agree to make Operator Qualifications portable, we were never asked to. Rather, we were coming to learn that the individual Plaintiffs were acting in concert, behind our back, and had taken and were using our property. As to that last point, we had absolutely no way to know whether these individuals (or others to whom they passed off our equipment) were properly maintaining the equipment, or were following industry standards or safety protocols. All we knew was that they had stolen our equipment and confidential and proprietary business information and were trying to hide the fact that they were working for 3B Inspection and Beall. Moreover, had there been any accidents involving Myrand, Grant, Bage, and Rogge, the Operator Qualifications would have tracked back to McDonald Oilfield and not their actual employer, 3B Inspection. These were all concerns Beall and 3B Inspection should certainly have been aware of. As such, in an effort to comply with industry standards and practices and because of our safety concerns, McDonald Oilfield suspended the Operator Qualifications. We felt we had no choice in this matter, since we had no way of knowing who was using our equipment, let alone how it was being maintained. Notably, our decision did not and does not prevent 3B Inspection from sponsoring Operator Qualifications for the same individuals.

McDonald Oilfield further asserted that it could have made the Operator Qualifications "portable" but did not because "i) it was not asked; ii) the individual plaintiffs seemed to be acting deceptively and in concert behind its back; and iii) since the individual plaintiffs had completely severed their relationship with McDonald Oilfield, it was no longer in any position to monitor or supervise their performance or adherence to safety-related standards."

6

On October 3, 2017, Latischia McDonald talked to Rogge's mother, Tammy Rogge, on the phone, warning her that Rogge was in breach of his employment agreement with McDonald Oilfield because he had retained some proprietary software and that she did not want Rogge "involved in anything that could cause 'legal problems.'" Later that same day, McDonald Oilfield contacted the Fort Bend County Sheriff's Office to report stolen property. Rogge arrived later that afternoon at the McDonald Oilfield facility to return the mapping software and observed a sheriff's deputy arrive to prepare a police report for the stolen property.

Also on October 3, McDonald Oilfield received a cease and desist letter from 3B Inspection's lawyer. The letter stated:

> McDonald Oilfield is making false and disparaging comments about 3B Inspection to clients of 3B Inspection in order to unlawfully interfere with [its] business relationships. McDonald Oilfield has also been contacting, threatening, and making defamatory statements towards 3B Inspection's employees Chris Myrand, Kyle Grant, Patrick Bage, and Dylan Rogge. Finally, 3B Inspection believes that McDonald Oilfield is also engaging in further unlawful conduct with the intention of harming the company's business, operations, and relationships with its current and prospective clients of 3B Inspection.

The letter requested that McDonald Oilfield cease and desist from engaging in the listed behavior. Beall also called McDonald Oilfield and spoke with Kelly McDonald, the owner. Beall expressed a desire for the two companies to work things out between them.

7

3B Inspection and the individual employees filed suit on October 4, 2017. Ultimately, 3B Inspection alleged causes of action for business disparagement, defamation, and tortious interference with a contract. 3B Inspection alleged generally that McDonald Oilfield "has engaged in a course of unlawful and malicious conduct intended to interfere with and cause harm to the business relationship between 3B Inspection and one of its current clients." 3B Inspection did not identify the client, but it alleged that the client "is a former client of McDonald Oilfield." 3B Inspection also made general statements that McDonald Oilfield's conduct included "making defamatory and disparaging remarks regarding 3B Inspection to its client, contacting and making disparaging remarks regarding 3B Inspection to certain employees of 3B Inspection who had been former independent contractors of McDonald Oilfield," disrupting or "attempting to disrupt the business operations of 3B Inspection and hinder 3B Inspection's performance on a client project," and "attempting to harm the business and reputation of 3B Inspection."

In its amended petition, 3B Inspection identified a single interaction that occurred, alleging that the unidentified client had informed 3B Inspection that Kelly McDonald had contacted the client and stated that 3B Inspection was "not a real company" and that Robert Beall "did not know what he was doing." 3B Inspection further alleged:

8

McDonald Oilfield intentionally caused the Operator Qualifications ('OQ') of certain Employees of 3B Inspection to be suspended. Without holding an appropriate and active OQ, 3B Inspection's Employees cannot perform their required duties on Plaintiff's projects. McDonald Oilfield caused the cancellation of these OQ's in order to hinder 3B Inspection's performance on a large project being performed for 3B Inspection's client (and a former client of McDonald Oilfield). This conduct by McDonald Oilfield was done with malicious intent to shut down the project and cause harm to 3B Inspection's business relationship with its client.

On October 30, 2017, McDonald Oilfield filed a counterclaim alleging causes of action for violations of the Texas Uniform Trade Secrets Act and the Texas Theft Liability Act, breach of contract, conversion, and conspiracy. McDonald Oilfield alleged specific facts regarding its working relationship with Myrand and the other individual employees, including that they had all agreed to keep certain proprietary technology and information confidential and to return all of McDonald Oilfield's property upon termination of their employment. McDonald Oilfield asserted that Myrand "kept and did not return a substantial amount of equipment belonging to McDonald Oilfield." It also alleged that the other individual employees had used some of the equipment to benefit 3B Inspection. McDonald Oilfield identified approximately $60,000 worth of property that was not returned as "including (but not necessarily limited to):

- 7 HANS (or L22) boxes, which are expensive pieces of technical equipment used to provide real-time tracking of a pig while being moved through a pipeline;
- 3 transmitters (two models CD42-T3, and one model SAP 102000);

9

- 1 Metrotech Line Locator with Backbox;
- 1 Pipeline Inspection Company Pig Tracker/Receiver
- 1 Wavetrack Receiver
- 1 Farwest pit gauge; and
- 1 set of custom-made pig-pulling poles."

McDonald Oilfield also alleged that it had provided all of the individual employees with particular software—"DeLorme Atlas"—that "is now being used on 3B jobs by former McDonald Oilfield contractors" and that the individual employees were "continuing to access a database for site documentation that was built by McDonald Oilfield Operations" at a cost of more than $20,000. McDonald Oilfield also alleged that "Beall colluded in, or aided and abetted 3B [Inspection], Myrand, Grant, Bage, and Rogge in their wrongful conduct alleged herein, including misappropriating McDonald Oilfield's trade secrets and equipment."

On December 4, 2017, McDonald Oilfield moved to dismiss all of 3B Inspection and the individual employees' claims against it pursuant to the TCPA. McDonald Oilfield argued that 3B Inspection and the individual employees had filed suit because of and in response to McDonald Oilfield's exercise of its right to free speech and right to petition. The motion to dismiss pointed out that 3B Inspection filed its lawsuit just one day after Rogge learned that McDonald Oilfield had made a report of theft to local law enforcement. It also argued that the factual basis for 3B Inspection's suit—alleged statements disparaging 3B Inspection and McDonald Oilfield's suspension of the individual employees'

10

Operator Qualifications—involved McDonald Oilfield's rights to free speech because all of the communications were on a matter of public concern, i.e., the operation and safety of oil and gas pipelines. McDonald Oilfield also sought attorney's fees, costs, and sanctions in the event it prevailed on its TCPA motion to dismiss. It provided an affidavit regarding attorney's fees.

Along with its motion to dismiss, McDonald Oilfield also filed the declaration of Latischia McDonald, the office manager for McDonald Oilfield, which set out many of the facts stated above. In addition to the details regarding McDonald Oilfield's work and details of maintaining Operator Qualifications, Latischia McDonald declared:

> to be a preferred vendor for the Department of Transportation, which McDonald Oilfield is, workers must have Operator Qualifications and be subject to drug testing policy. I am aware of no requirement that our company continue to sponsor or maintain Operator Qualifications for personnel who are no longer working with or for us. Rather, my understanding is that it is the obligation of whichever service company that has engaged the personnel to maintain or sponsor those individuals' Operator Qualifications.

McDonald Oilfield also provided copies of the independent contractor agreements and other employment documents pertaining to its employment of the individual employees as independent contractors, its anti-drug and alcohol misuse prevention plan as required by the U.S. Department of Transportation, and the cease and desist letter sent to McDonald Oilfield by 3B Inspection's attorney. McDonald Oilfield also provided the declaration of Kelly McDonald, stating that

11

he had received the cease and desist letter and the call from Beall the same day. Specifically, McDonald stated:

> Robert Beall, the owner of 3B Inspection called me on my company phone. Beall introduced himself and told me that maybe he should have made this call a "whole lot sooner to work things out." He indicated he "wasn't that kind of person." I understood that to mean that Beall was not the type of person to file a lawsuit. I explained that I was not sure why he was calling since McDonald Oilfield had just a few hours earlier received a cease and desist letter. I also told Beall that given the circumstances, I was not comfortable speaking with him at that time. During the brief conversation, in which Beall suggested we try to work things out, he did not mention that he had already filed a lawsuit against McDonald Oilfield.

After McDonald Oilfield filed its TCPA motion to dismiss, 3B Inspection amended its petition. The amended petition dropped the four individual employees as plaintiffs and the cause of action for tortious interference in prospective business relations, while retaining 3B Inspection and Beall's claims for defamation, business disparagement, and tortious interference with contract. 3B Inspection and Beall then responded to the motion to dismiss. The individual employees were not listed in the response to McDonald Oilfield's motion to dismiss. However, at the hearing on the motion, the attorney for 3B Inspection and Beall stated on the record that he still represented the individual employees and that they also intended to join the response to the motion. Nevertheless, the response did not provide any argument supporting the individual employees' claims or the dropped tortious interference claim.

12

In its written response, 3B Inspection asserted that the claims it alleged in its petition were not the kind that were covered by the TCPA, but were based on McDonald Oilfield's actions in cancelling the individual employees' Operator Qualifications and in Kelly McDonald's making disparaging remarks about 3B Inspection and Beall. Specifically, 3B Inspection argued in its response:

> 3B Inspection did not file this lawsuit against McDonald Oilfield due to McDonald Oilfield exercising its right to cancel the OQ's of its employees. . . . Instead, 3B Inspection filed this lawsuit against McDonald Oilfield due to the obvious wrongful intent behind the timing and manner of McDonald Oilfield's cancellation of the OQ's. . . . The timing of McDonald Oilfield's was clearly aimed at interfering with 3B Inspection's contract with its Customer.

3B Inspection further stated in its response to the motion to dismiss that it filed the lawsuit based on the statements made against 3B Inspection as identified by Beall and Simko, and it stated that McDonald Oilfield's allegations that either Beall or the individual employees had stolen any equipment were false. 3B Inspection also argued that it could establish a prima facie case on each essential element of its claims. It listed its business disparagement, defamation, and tortious interference with contract claims, again making general allegations and referring to the specific evidence set out in the affidavits of Beall and Simko.

In his affidavit, Robert Beall set out the history of his business and his experience in the oil and gas field. He also stated:

> In April of 2017, I first met with the owner of a current customer of 3B Inspection (hereinafter, the "Customer") who had previously done

13

business with McDonald Oilfield. The Customer expressed his displeasure with McDonald Oilfield to me and agreed to use 3B Inspection for some pipeline projects. The Customer and 3B Inspection have entered into a Master Services Agreement ("MSA"). . . . McDonald Oilfield has engaged in conduct that I believe was intended to disrupt the business operations of 3B Inspection and to hinder 3B Inspection's performance on its MSA with the Customer. McDonald Oilfield intentionally caused the Operator Qualifications ("OQ") of certain employees of 3B Inspection (who previously were independent contractors of McDonald Oilfield) to be suspended.

Beall averred that the individual employees could not perform their regular duties without Operator Qualifications. Beall acknowledged that McDonald Oilfield had "the general right to take this action," but he maintained that "the manner and timing of this action by McDonald Oilfield conflicted with industry norms and was obviously intended to disrupt 3B Inspection's performance of its contract with the Client." Beall also averred that 3B Inspection had taken steps to ensure that none of the individual employees had retained or were using any stolen equipment and that it had agreed to a temporary injunction and had abided by its terms. Beall also stated that 3B Inspection did not file its lawsuit in response to McDonald Oilfield's contacting law enforcement or "due to McDonald Oilfield making any type of police report related to 3B Inspection or its employees or for McDonald Oilfield reporting the theft of any property by 3B Inspection or its employees." Instead, he averred that "3B Inspection filed this lawsuit against

14

McDonald Oilfield due to the facts stated in this Affidavit and the Affidavit of Greg Simko."

Simko's affidavit stated that he was the co-president of 3B Inspection. He averred, "McDonald Oilfield has made defamatory comments and engaged in conduct that I believe was intended to disrupt the business operations of 3B Inspection and to hinder 3B Inspection's performance on its MSA with the Customer." Specifically, Simko stated:

> 3B Inspection was also informed by the Customer that Kelly McDonald, President of McDonald Oilfield, contacted the Customer upon learning that the Customer had hired 3B Inspection. 3B Inspection was informed that, during that conversation, Mr. McDonald defamed 3B Inspection and Robert Beall by stating among other things, that 3B Inspection was "not a real company" and that Robert Beall "did not know what he was doing."

Simko repeated some of the same statements made by Beall regarding the reasons underlying 3B Inspection's filing suit as relating to the cancellation of the individual employees' Operator Qualifications. Regarding damages, Simko averred:

> McDonald Oilfield's conduct has caused 3B Inspection to incur damages. Among other things, McDonald Oilfield's conduct has damaged 3B Inspection by: (a) causing damage to 3B Inspection's business and profits such as delay damages; and (b) causing damage to the reputation of 3B Inspection. 3B Inspection has also brought this action for the purpose of vindicating its character and reputation.

3B Inspection also attached its employment agreement with Myrand to its response to the motion to dismiss. It attached a copy of the agreed temporary injunction.

3B Inspection and Beall amended their petition on January 16, 2018, to include the factual allegations set out in its response and accompanying affidavits.

The trial court held a hearing and, on January 31, 2018, denied McDonald Oilfield's TCPA motion to dismiss 3B Inspection's claims against it. This interlocutory appeal followed.

## Dismissal Under the TCPA

In its first two issues on appeal, McDonald Oilfield asserts that the trial court erred in denying its motion to dismiss pursuant to the TCPA because it established that 3B Inspection's claims fell within the scope of the TCPA. McDonald Oilfield asserts that it demonstrated that 3B Inspection's claims were based on, related to, or were filed in response to McDonald Oilfield's exercise of its right to petition, by reporting the alleged theft to law enforcement, and its right to speak on a matter of public concern, by suspending the individual employees' Operator Qualifications and making other statements relevant to the safety of oil and gas pipeline activities.

## A.    Standard of Review

We review de novo the denial of a TCPA motion to dismiss. *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 353

16

(Tex. App.—Houston [1st Dist.] 2013, pet. denied); *see also Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (applying de novo standard to TCPA motion to dismiss denied by operation of law) (citing *Avila v. Larrea*, 394 S.W.3d 646, 652–53, 656 (Tex. App.—Dallas 2012, pet. denied)). In determining whether to grant or deny a motion to dismiss, the court must consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. TEX. CIV. PRAC. & REM. CODE § 27.006(a). We view the evidence in the light most favorable to the nonmovant. *Dolcefino*, 540 S.W.3d at 199; *see Cheniere Energy, Inc. v. Lotfi*, 449 S.W.3d 210, 214 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

**B.    TCPA Statutory Scheme**

The stated purpose of the TCPA "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."[1] TEX. CIV. PRAC. & REM. CODE § 27.002. The Act further

---

[1]    We note that, in its most recent session, the Texas Legislature amended the TCPA. The amendments are effective September 1, 2019. Because this suit was filed before the effective date of the amendments, it is governed by the statute as it existed before the amendments, and all of our citations and analysis are to the TCPA as it exists prior to September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§1–12, 2019 Tex. Sess. Law Serv. (to be codified at TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011).

17

expressly provides, "This chapter shall be construed liberally to effectuate its purpose and intent fully." *Id.* § 27.011(b).

Materially here, the TCPA provides, "If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action." *Id.* § 27.003. The Act defines "legal action" as "a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *Id.* § 27.001(6). It further defines "exercise of the right of free speech" to mean "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). It defines "exercise of the right to petition" to mean:

(A) a communication in or pertaining to:

(i) a judicial proceeding; [or]

(ii) an official proceeding, other than a judicial proceeding, to administer the law;

. . . .

(C) a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding; [and]

. . . .

(E) any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.

18

*Id.* § 27.001(4).

The TCPA defines "communication" as including "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). And it defines "matter of public concern" as including "an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7).

The TCPA further states:

(b) Except as provided by Subsection (c), on the motion of a party under Section 27.003, a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of:

    (1) the right of free speech;

    (2) the right to petition; or

    (3) the right of association.

(c) The court may not dismiss a legal action under this section if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question.

(d) Notwithstanding the provisions of Subsection (c), the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim.

*Id.* § 27.005.

The Texas Supreme Court has recognized that the stated purpose of the TCPA is "to 'encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.'" *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (quoting Tex. Civ. Prac. & Rem. Code § 27.002); *Hersh v. Tatum*, 526 S.W.3d 462, 466 (Tex. 2017) (same).

To effectuate the purpose of the Act, the TCPA provides a motion-to-dismiss procedure that allows defendants who claim that a plaintiff has filed a meritless suit in response to the defendant's proper exercise of a constitutionally-protected right to seek dismissal of the underlying action, attorney's fees, and sanctions at an early stage in the litigation. *See* Tex. Civ. Prac. & Rem. Code § 27.003(a); *Dolcefino*, 540 S.W.3d at 198. "The primary means by which the TCPA advances its purpose is . . . an expedited dismissal mechanism tied to a burden-shifting analysis 'through which a litigant may require, by motion, a threshold testing of the merits of legal [actions] that are deemed to implicate the express interests protected by the statute.'" *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 201 (Tex. App.—Austin 2017, pet. dism'd)

20

(quoting *Serafine v. Blunt*, 466 S.W.3d 352, 369 (Tex. App.—Austin 2015, no pet.) (Pemberton, J., concurring)).

Courts use a "two-step procedure to expedite the dismissal of claims brought to intimidate or to silence a defendant's exercise of these First Amendment rights." *Coleman*, 512 S.W.3d at 898 (citing TEX. CIV. PRAC. & REM. CODE § 27.003 and *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding)); *Dolcefino*, 540 S.W.3d at 198. First, the defendant moving for dismissal of a suit pursuant to the TCPA on the ground that the plaintiff's suit was brought against him "to intimidate or to silence [his] exercise of . . . First Amendment rights" must show by a preponderance of evidence that the suit he is seeking to dismiss "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech, (2) the right to petition, or (3) the right of association." *Coleman*, 512 S.W.3d at 898; *Dolcefino*, 540 S.W.3d at 198; *see* TEX. CIV. PRAC. & REM. CODE § 27.005(b).

If the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the moving party's exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association, the "court shall dismiss the legal action" unless "the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE § 27.005(b), (c).

Thus, the burden shifts to the plaintiff resisting the TCPA dismissal to establish a prima facie case for the claim in question. *Id.*; *see Coleman*, 512 S.W.3d at 899; *Dolcefino*, 540 S.W.3d at 199. If the TCPA applies and the plaintiff has not met the required showing of a prima facie case, the trial court must dismiss the plaintiff's claim. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b); *Coleman*, 512 S.W.3d at 899; *Dolcefino*, 540 S.W.3d at 199.

## C.    Applicability of the TCPA

Here, the trial court denied McDonald Oilfield's motion to dismiss 3B Inspection's claims pursuant to the TCPA. It stated on the record at the hearing that it did not believe that 3B Inspection's claims were the types of claims that fell within the scope of the TCPA. We disagree.

3B Inspection pleaded causes of action for defamation, business disparagement, and tortious interference with contract. It identified two particular communications or actions undertaken by McDonald Oilfield as being the basis for all three causes of action. First, 3B Inspection asserted that Kelly McDonald contacted a former client who had since contracted to do business with 3B Inspection. During a conversation with the former client, McDonald allegedly stated that 3B Inspection was "not a real company" and that Robert Beall "did not know what he was doing."  Second, 3B Inspection asserted that McDonald Oilfield suspended the Operator Qualifications of the individual employees in a manner

22

that showed "malicious intent to shut down the project and cause harm to 3B Inspection's business relationship with its client."

McDonald Oilfield was required to show by a preponderance of evidence that 3B Inspection's suit was "based on, related to, or [was] in response to [McDonald Oilfield's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b); *Coleman*, 512 S.W.3d at 898.

McDonald Oilfield argued, in part, that the alleged defamatory and disparaging statements by Kelly McDonald and the communication cancelling its sponsorship of the individual employees' Operator Qualifications were an exercise of free speech, i.e., communications on a matter of public concern, because they were made regarding either the theft of their equipment or the operation and safety of oil and gas pipelines. As defined in the TCPA, the "exercise of the right of free speech" means "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). A "matter of public concern" includes "an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7).

In *Coleman*, the supreme court addressed the question of whether internal communications within a pipeline company regarding an employee's alleged

23

failure to follow a required fuel-tank "gauging" procedure sufficed as the "exercise of the right of free speech," specifically "communication[s] made in connection with" an issue related to "health or safety" or "environmental [or] economic . . . well-being." 512 S.W.3d at 898–901. The supreme court reaffirmed that "the TCPA's plain language does not require communication in public form" and that the TCPA does not require "that communication involve more than a 'tangential relationship' to matters of public concern." *Id.* at 900.

The challenged statements—regarding 3B Inspection and Beall's business and the sponsorship of the Operator Qualifications—are communications under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(1) (defining "communication" as including "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic"). Furthermore, the statements regarding Operator Qualifications were on a matter of public concern because they concerned the qualifications and sponsorship of the individual employees to perform certain tasks that could impact environmental, health, safety, and economic concerns associated with noxious and flammable chemicals transported through pipelines. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7)(A)–(B); *Coleman*, 512 S.W.3d at 901. Likewise, the purported comments that 3B Inspection was "not a real company" and that Beall did not "know what he was doing" are statements concerning a matter of public concern as

24

they related to "a good, product, or service in the marketplace." *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7)(E).

Therefore, we conclude that McDonald Oilfield successfully established the TCPA's applicability to 3B Inspection's suit under the TCPA free-speech prong. *See id.* § 27.003(a); *Coleman*, 512 S.W.3d at 901–02. Accordingly, we need not address McDonald Oilfield's alternative argument that 3B Inspection's lawsuit was filed in response to McDonald Oilfield's exercise of its right to petition. *See Coleman*, 512 S.W.3d at 901–02.

## D. Clear and Specific Proof of Each Claim

Because we have concluded that the claims asserted by 3B Inspection were based on, related to, or filed in response to McDonald Oilfield's exercise of its right to free speech as defined by the TCPA, we turn now to whether 3B Inspection provided clear and specific proof on each essential element of each of its claims. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b), (c); *Coleman*, 512 S.W.3d at 899; *Dolcefino*, 540 S.W.3d at 199.

To avoid dismissal under the TCPA, the plaintiff must establish a prima facie case for each element of the asserted claims by clear and specific evidence. TEX. CIV. PRAC. & REM. CODE § 27.005(c). Although the TCPA does not define the phrase "clear and specific evidence," the supreme court has held that the standard requires more than mere notice pleadings and that the plaintiff "must

25

provide enough detail to show the factual basis for its claim." *See D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017); *In re Lipsky*, 460 S.W.3d at 591. A "prima facie case" refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted; stated another way, it is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)).

When considering the motion to dismiss, the court considers both the pleadings and any supporting and opposing affidavits. TEX. CIV. PRAC. & REM. CODE § 27.006(a); *D Magazine Partners*, 529 S.W.3d at 434. The supreme court has expressly disapproved interpretations of the TCPA that "require direct evidence of each essential element of the underlying claim to avoid dismissal," and, instead, it has held that pleadings and evidence that establish the facts necessary to support the essential elements of a claim are sufficient to resist a TCPA motion to dismiss. *In re Lipsky*, 460 S.W.3d at 590–91.

3B Inspection asserted defamation, business disparagement, and tortious interference with contract claims against McDonald Oilfield.

### 1. *Defamation*

To prevail on its defamation claim, 3B Inspection had to prove that McDonald Oilfield (1) published a false statement of fact to a third party, (2) that

was defamatory concerning 3B Inspection, (3) with the requisite degree of fault, and (4) damages. *See id.* at 593 (citing *Waste Mgmt. of Tex. Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 146 n.7 (Tex. 2014), and *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). "[T]he plaintiff must plead and prove damages, unless the defamatory statements are defamatory per se." *Id.* (citing *Waste Mgmt. of Tex.*, 434 S.W.3d at 146 n.7); *see also Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013) (defamation per se refers to statements that are so obviously harmful that general damages may be presumed).

3B Inspection alleged generally that McDonald Oilfield and Kelly McDonald disparaged and defamed 3B Inspection and the individual employees. It specifically identified a conversation between Kelly McDonald and an unnamed "Customer," stating that "3B Inspection was informed that, during that conversation, Mr. McDonald defamed 3B Inspection and Robert Beall by stating among other things, that 3B Inspection was 'not a real company' and that Robert Beall 'did not know what he was doing.'"

McDonald Oilfield argues that these statements are not defamatory because 3B Inspection presented no evidence that Kelly McDonald's purported statements were objectively verifiable statements of fact, as opposed to his opinions. It also argues that 3B Inspection presented insufficient evidence of damages because Simko's affidavit as to damages was conclusory.

Regarding the damages suffered by 3B Inspection as a result of the disparaging or defamatory comments, Greg Simko averred that:

> McDonald Oilfield's conduct has caused 3B Inspection to incur damages. Among other things, McDonald Oilfield's conduct has damaged 3B Inspection by: (a) causing damage to 3B Inspection's business and profit such as delay damages; and (b) causing damage to the reputation of 3B Inspection. 3B Inspection has also brought this action for the purpose of vindicating its character and reputation.

Simko also averred that:

> McDonald Oilfield's sudden cancellation of the OQ's damage[d] 3B Inspection's business reputation and caused delay and added expense to its project with the Customer. 3B Inspection had to have an individual drive several hours to the jobsite in order to get the OQ's reinstated. If 3B Inspection had not taken these actions and incurred these expenses to expedite the reinstatement of the OQ's, its project for the Customer would have been completely shut down.

Regarding the allegation that 3B Inspection incurred expenses to expedite the reinstatement of the individual employees' Operator Qualifications, we observe that there is no evidence in the record demonstrating that McDonald Oilfield bore any obligation to maintain the Operator Qualifications for 3B Inspection's employees. To the contrary, the evidence in the record indicates—and 3B Inspection essentially agreed—that each employer bears the obligation of maintaining the Operator Qualifications for its own employees. 3B Inspection provided some evidence that it is possible for an employer to transfer a former employee's Operator Qualifications to his new employer, but there is no evidence that such a transfer is required. Any expenses incurred by 3B Inspection in

reinstating the Operator Qualifications were to fulfill 3B Inspection's own obligations and are no evidence of damages resulting from defamation.

Regarding the remaining evidence of damages arising from the alleged defamation, McDonald Oilfield argues that Simko's affidavit is conclusory and therefore insufficient to satisfy the TCPA's requirement of "clear and specific evidence," and we agree. "Bare, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *In re Lipsky*, 460 S.W.3d at 592. Generally, a defamation plaintiff must prove actual damages to prevail— "[c]ompensatory damages in defamation cases must compensate for '*actual* injuries' and cannot merely be 'a disguised disapproval of the defendant.'" *Brady v. Klentzman*, 515 S.W.3d 878, 886–87 (Tex. 2017) ("Showing that the community was aware of and discussed the defamatory statements is not enough; there must be evidence that people believe the statements and the plaintiff's reputation was actually affected."). Nothing in Simko's affidavit or any other pleadings or evidence submitted by 3B Inspection indicates the existence of actual damages or that anyone, including the unidentified client, actually believed Kelly McDonald's statement to the detriment of 3B Inspection's reputation.

3B Inspection argues, however, that it did not have to submit proof of defamation damages because McDonald Oilfield's comments constituted

29

defamation per se. "When an offending publication qualifies as defamation per se, a plaintiff may recover general damages without proof of any specific loss." *In re Lipsky*, 460 S.W.3d at 596; *Hancock*, 400 S.W.3d at 63–64 (distinguishing defamation claims as either per se or per quod). "Defamation per se refers to statements that are so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed." *In re Lipsky*, 460 S.W.3d at 596. Defamation per se includes statements accusing someone of a crime, of having a foul or loathsome disease, of engaging in serious sexual misconduct, or, relevant here, "[r]emarks that adversely reflect on a person's fitness to conduct his or her business or trade." *Id.* (citing *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.), and *Hancock*, 400 S.W.3d at 66). "[W]hether a statement qualifies as defamation per se is generally a question of law." *Id.*

3B Inspection argues that Kelly McDonald's alleged statements to its client that 3B Inspection was "not a real company" and that Robert Beall "did not know what he was doing" reflected on 3B Inspection and Beall's professional abilities. To qualify as defamation per se under this category the disparaging words must affect the plaintiff in some manner that is peculiarly harmful to the plaintiff's trade, business, or profession and do not merely reflect upon the plaintiff's general characteristics. *See In re Lipsky*, 460 S.W.3d at 596; *Hancock*, 400 S.W.3d at 66–67 (noting that statement injures one in his profession when it would "adversely

30

affect his fitness for the proper conduct" of business). But here, the statements are very general and devoid of larger context. Kelly McDonald allegedly contacted his former client—now a current client of 3B Inspection—and stated that 3B Inspection was not a real company and that its owner did not know what he was doing. While this might impugn 3B Inspection's and Beall's general characteristics, it is not, as a matter law, a statement that addressed their business or trade in some peculiarly harmful way.

We conclude that 3B Inspection did not present sufficient evidence to demonstrate that the alleged defamation was defamatory per se, nor did it present clear and specific proof of defamation damages, which is an essential element of its defamation claim. The trial court erred in denying McDonald Oilfield's TCPA motion to dismiss on this claim.

### 2. Business Disparagement

"Business disparagement and defamation are similar in that both involve harm from the publication of false information." *In re Lipsky*, 460 S.W.3d at 591 (citing *Waste Mgmt. of Tex.*, 434 S.W.3d at 155). However, these two torts are different in that they "serve different interests": business disparagement "applies to derogatory publications about the plaintiff's economic or commercial interests," while defamation protects "the personal reputation of an injured party." *Id.* "A corporation or other business entity that asserts a claim for defamation may assert

31

an additional or alternative claim for business disparagement if it seeks to recover economic damages for injury to the business." *Id.* ("Impugning one's reputation is possible without disparaging its commercial interests and vice versa. Depending on the circumstances, then, a plaintiff may have a claim for defamation, or for business disparagement, or both.") (citing *Burbage v. Burbage*, 447 S.W.3d 249, 261 n.6 (Tex. 2014)).

"To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Id.* at 592 (citing *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)). 3B Inspection points to the affidavits of Robert Beall and Greg Simko as containing evidence supporting the essential elements of its business disparagement and defamation claims. McDonald Oilfield argues, in part, that the affidavits are conclusory as to damages. Damages are an essential element of 3B Inspection's business disparagement claim. *See id.*

As we already observed with regard to the defamation claim, "[b]are, baseless opinions do not create fact questions, and neither are they a sufficient substitute for the clear and specific evidence required to establish a prima facie case under the TCPA." *Id.* As the supreme court in *In re Lipsky* held, "general averments of direct economic losses and lost profits, without more, [do not] satisfy

the minimum requirements of the TCPA." *Id.* at 593 (holding that affidavit stating that plaintiff suffered "direct pecuniary and economic losses and costs, lost profits, loss of its reputation, and loss of goodwill in the communities in which it operates . . . in excess of three million dollars" was "devoid of any specific facts illustrating how defendant's alleged remarks caused such losses"). Thus, Simko's general statement that 3B Inspection suffered unspecified "delay damages" and "damage to its reputation," without more, is insufficient to establish damages for business disparagement or defamation.

Accordingly, we conclude that the trial court abused its discretion in denying McDonald Oilfield's TCPA motion to dismiss this claim.

### 3. *Tortious Interference with Contract*

To establish its claims that McDonald Oilfield tortiously interfered with a contract, 3B Inspection had to prove: (1) an existing contract subject to interference and (2) a willful and intentional act of interference with the contract (3) that proximately caused 3B Inspection injury and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Serafine*, 466 S.W.3d at 361 (considering tortious interference in context of TCPA motion to dismiss). "To prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a specific contract." *John Moore Servs.*, 441 S.W.3d at 361 (quoting *Funes v. Villatoro*, 352 S.W.3d 200,

33

213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)). To establish interference with a contract, "the plaintiff must present evidence that some obligatory provision of a contract has been breached." *Id.*

Here, 3B Inspection alleged generally that McDonald Oilfield had attempted to disrupt the business relationship between it and a current, unidentified client. Robert Beall averred that "The Customer expressed his displeasure with McDonald Oilfield to me and agreed to use 3B Inspection for some pipeline projects. The Customer and 3B Inspection have entered into a Master Services Agreement ('MSA')." And Greg Simko alleged generally that "McDonald Oilfield's conduct has damaged 3B Inspection by: (a) causing damage to 3B Inspection's business and profit such as delay damages; and (b) causing damage to the reputation of 3B Inspection."

While 3B Inspection provided some evidence that a contract existed between itself and its client, nothing in the pleadings, affidavits, or other evidence provided details about the specific terms of the MSA between 3B Inspection and its client. There was no evidence regarding how the purported MSA was breached. A general statement that a contract with a customer exists, without details about the specific terms of the contract, is insufficient to maintain a tortious-interference-with-contract claim. *Serafine*, 466 S.W.3d at 362; *John Moore Servs.*, 441 S.W.3d at 361 (concluding that nonmovant did not present clear and specific evidence of

34

existence of contracts, specific terms of contracts, or evidence of how contract was breached and thus failed to establish prima facie case for contract element of tortious-interference claim); *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied) (same). 3B Inspection likewise failed to identify any actual damages or loss related to any interference with this contract. *See Prudential Ins. Co. of Am*, 29 S.W.3d at 77; *Serafine*, 466 S.W.3d at 361.

We conclude that 3B Inspection failed to provide clear and specific proof regarding essential elements of its tortious interference with a contract claim, and, thus, the trial court abused its discretion in denying McDonald Oilfield's motion to dismiss this claim pursuant to the TCPA.

### 4. *Nonsuited claims*

In part of its third issue, McDonald Oilfield argues that its TCPA motion to dismiss sought affirmative relief, and, thus, it survived the individual employees' nonsuit of all their claims and 3B Inspection's nonsuit of its claim for tortious interference with prospective business relations. McDonald Oilfield argues that, because the individual employees made no effort to provide clear and specific proof of a prima facie case for their claims, it was entitled to a dismissal with prejudice of those claims as well as the related costs and attorney's fees. Likewise, because 3B Inspection made no effort to present clear and specific evidence of its

35

tortious interference with prospective business relations claim, McDonald Oilfield was entitled to dismissal of that claim with prejudice plus related fees.[2]

"A plaintiff has an absolute right to nonsuit a claim before resting its case-in-chief, but a nonsuit 'shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief.'" *CTL/Thompson Tex., LLC v. Starwood Homeowner's Ass'n, Inc.*, 390 S.W.3d 299, 300 (Tex. 2013) (quoting TEX. R. CIV. P. 162, which further provides that nonsuit "shall have no effect on any motion for sanctions, attorney's fees or other costs, pending at the time of the dismissal"). Thus, 3B Inspection and the individual employees had an absolute right to nonsuit any or all of their claims, but their decision to nonsuit does not affect McDonald Oilfield's right to continue to pursue independent claims for affirmative relief. *See id.*; *Gaskamp v. WSP USA, Inc.*, —S.W.3d—, No. 01-18-00079-CV, 2018 WL 6695810, at *9 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet. h.) (citing *Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL

---

[2] 3B Inspection and the individual employees do not respond directly to this argument. In their original brief on appeal, 3B Inspection and the individual employees asserted that the individual employees joined 3B Inspection's response to McDonald Oilfield's TCPA motion to dismiss and that the trial court's denial of the motion to dismiss was proper as to all parties. On rehearing, 3B Inspection and the individual employees construe McDonald Oilfield's complaint as "attempting to bar 3B Inspection from bringing a **_new_** cause of action that did not accrue until after this appeal was filed." We note that this opinion does not address any causes of action that arose among the parties after the pleadings in this current appeal were filed or that might arise in the future. We consider only the pleadings that were before the trial court at the time it ruled on McDonald Oilfield's motion for dismissal pursuant to the TCPA.

3118601, at *13 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied) (mem. op.)).

"A motion to dismiss that affords more relief than a nonsuit provides constitutes a claim for affirmative relief, which survives nonsuit," and a TCPA motion is such a motion because, unlike a nonsuit, the TCPA motion to dismiss provides for a dismissal with prejudice in addition to recovery of attorney's fees and sanctions. *Gaskamp*, 2018 WL 6695810, at *9; *Abatecola*, 2018 WL 3118601, at *14; *Rauhauser v. McGibney*, 508 S.W.3d 377, 381 (Tex. App.—Fort Worth 2014, no pet.), *overruled on other grounds by Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017)); *see also The Iola Barker v. Hurst*, No. 01-17-00838-CV, 2018 WL 3059795, at *5 (Tex. App.—Houston [1st Dist.] June 21, 2018, no pet.) (mem. op.) (holding that TCPA motion to dismiss, seeking dismissal with prejudice and attorney's fees, costs, and sanctions, constituted "pending claim for affirmative relief" within meaning of Rule 162); *Walker v. Hartman*, 516 S.W.3d 71, 80 (Tex. App.—Beaumont 2017, pet. denied) (recognizing that TCPA motion to dismiss survives nonsuit).

Here, McDonald Oilfield's TCPA motion requested not only dismissal with prejudice, but also costs, attorney's fees, and sanctions. Thus, its motion survived the nonsuit of the individual employees' claim and 3B Inspection's tortious interference with prospective business relations claim. And because the individual

37

employees made no attempt to provide clear and specific proof regarding essential elements of their claims, and because 3B Inspection made no attempt to provide clear and specific proof regarding the essential elements of its tortious interference with prospective business relations claim, the trial court erred in denying McDonald Oilfield's TCPA motion to dismiss on those claims. *See Gaskamp*, 2018 WL 6695810, at *9; *Abatecola*, 2018 WL 3118601, at *14; *The Iola Barker*, 2018 WL 3059795, at *5.

## Conclusion

We hold that McDonald Oilfield satisfied its burden under the TCPA to show that 3B Inspection and the individual employees' claims against it are based on, relate to, or are in response to, the exercise of its free speech rights. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). We further hold that 3B Inspection and the individual employees have failed to sustain their burden to show, by clear and specific evidence, a prima facie case for each essential element of their claims. *See id.* § 27.005(c). We therefore reverse the trial court's denial of the motion to dismiss and remand the case to the trial court for further proceedings consistent with this opinion. *See id.* § 27.009(a); *John Moore Servs.*, 441 S.W.3d at 362.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Kelly.

38