# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-22-00071-CV

**Jonathan Timothy Noyes, Appellant**

**v.**

**The State of Texas for the Protection of Samantha Jo Voges, Appellee**

## FROM THE 22ND DISTRICT COURT OF COMAL COUNTY
## NO. C2021-0680A, THE HONORABLE DEBORAH WIGINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our previous opinion and judgment issued on October 13, 2023, and substitute the following opinion and judgment in their place. We deny appellant's motion for rehearing.

Appellant Jonathan Timothy Noyes challenges a lifetime protective order issued against him for the protection of his ex-girlfriend, Samantha Jo Voges. In five issues on appeal, Noyes asserts that the district court failed to make fact findings that he claims were required; that the evidence is insufficient to support the order; that the communication that subjected him to the protective order was constitutionally protected speech; that the underlying harassment statute that formed the basis for the protective order is unconstitutionally vague and ambiguous; and that the district court abused its discretion by excluding evidence. We will affirm the district court's order.

## BACKGROUND

In April 2021, the State filed an application for a protective order against Noyes on behalf of Voges. In an affidavit attached to the application, Voges averred that she met Noyes in January 2019, their "relationship moved very quickly," and they "moved in together in March 2019." According to Voges, "He was always very paranoid throughout our whole relationship that I was cheating on him. He would tell me that if I ever cheated on him that I would regret it, he would ruin my life, and they would find me in a dumpster." Voges ended their relationship in late February 2021, which is when Noyes's alleged harassment began. Voges averred:

> Since ending the relationship, I have received thousands of texts messages from Jonathan. These text[s] are threatening, alarming, tormenting, and harassing. I have blocked 60-70 different phone numbers and emails he has tried to contact me from. I have changed my phone number multiple times. He has used spoofed numbers to make it look like my mother and Comal County [are] calling me. I have deleted accounts from multiple social media platforms due to his harassment and slandering behavior. He has also contacted my parents.

Voges proceeded to describe Noyes's behavior in detail and concluded her affidavit with the following:

> I want a protective order because I fear for my safety. His harassing activity continues to get worse and more extreme. He is not stopping. He continues to threaten to ruin my life. I am scared that he will show up and harm me. I don't know what he is capable of doing to me. I am scared that he could hurt me or even kill me.

The district court issued a temporary protective order and set the application for a hearing to determine whether a final protective order should be granted.

2

At the hearing, Voges testified that her relationship with Noyes was "[g]ood at first and then tumultuous." They "[d]id not get along for . . . most . . . of the relationship." According to Voges, Noyes drank alcohol daily, was "[t]ormenting, mean, [and] harassing" when he was intoxicated, and was "controlling." Voges explained:

> He would question me if I didn't make it home at a certain amount of time from work. I couldn't go across the street to a neighbor's house. He thought I was doing something I shouldn't be doing. Anywhere that I went, I had to keep tabs with him. That kind of thing, as far as controlling goes.

Noyes would also access Voges's bank and cloud accounts without her knowledge.

On February 26, 2021, Voges was at work when she received a text message and phone calls from Noyes, who "was irate and upset because he had found a T-shirt in a hamper of clothes [she] was going to donate and then started questioning [her] on that T-shirt and who owned that T-shirt." Voges "tried to get him to calm down," but Noyes "said if [she] didn't leave work at that moment and come get [her] things, he was going to throw all of my belongings, along with my dog, out on the street." Voges asked her employer if she could leave work, told him that it was an emergency, and went back to their house. Once there, Voges "started right away to pack things" and told Noyes that she was leaving him, that she "wasn't interested anymore because of previous complaints by him, previous arguing over thinking that [she] was not faithful." Noyes tried to block her from leaving, and Voges screamed and pushed him out of the way. Noyes then took Voges's dog out of her arms, locked the dog in the bedroom, and prevented Voges from entering the room. When Noyes eventually let her in, Voges went to the bathroom to gather her things. When she "tried to exit out of the bathroom," Noyes "again closed the door and stood in front of it and wouldn't let [her] leave, whereas then

3

[she] screamed and yelled again to try to get him out of the way so that [she] could exit the room." When Noyes "finally did move out of the way," Voges discovered that Noyes had been recording her so that it would appear she was "acting crazy, for lack of a better word, for wanting to leave."

After Voges moved out of the house, Noyes would continue to contact her "[e]very day," even though she repeatedly told him that "the relationship was over." Voges tried to stop him from contacting her, to no avail. She explained:

> I blocked his phone number, then he would text me from another phone number, I would block that phone number. And it continued so on and so forth for dozens of phone numbers. Finally, he would start emailing me. I blocked those emails to which he would make new emails with my name and derogatory slang in them to try to get ahold of me.

From these phone numbers and emails, Noyes was "[t]hreatening, harassing, saying anything he could to try to get [Voges] to communicate back with him." Noyes communicated "predominantly" through text messages, although Voges "would still get phone calls" from Noyes, most of which she would not answer. Noyes continued to communicate with Voges through April 2021. On the few occasions when Voges communicated with Noyes in return, she was "[t]elling him to stop contacting [her] and to leave [her] alone." However, Noyes continued to contact her. Several text messages mentioned Voges's parents and her parents' home.

Additionally, Voges was concerned that Noyes was following her "[b]ecause he texted [her] saying that he was going to show up at numerous places where [she] was, and he knew exactly where [she] was all of the time." Voges found a tracking device attached to her vehicle, which she gave to the police. Some of the text messages that Voges received had referenced her location at the time. In these messages, Noyes threatened to disclose personal

4

information to her co-workers, her friends, and her parents, and he called Voges vulgar names such as "slut," "whore," and "cunt." In one message, Noyes wrote, "If you block this, I'm going to your parents. They can shoot me all they want. At least now everyone knows you're a liar. I swear I'm coming. You come talk civil or I'll go tell civil."[1] In response to one message, Voges wrote, "PLEASE STOP TIM!!! I'm begging you!!" In response to another message, Voges wrote, "You are threatening me and harassing me and I am now afraid for my life." To that, Noyes responded, "That's what a dumb whore drunk would try to say." Although these messages came from multiple phone numbers and email accounts, Voges believed they were all from Noyes because of "[t]he verbiage, the spelling, the way that he talks to [her]. There were certain emails that he would make with [her] name in it. [Voges] knew that they were from him." These email addresses included "sammywhore@mail.com," "cheatingsam@mail.com," and "admititcheater@mail.com."

Voges reported Noyes to the police "at least eight or nine" times. Voges testified that Noyes's messages had caused her to be concerned for her safety. She recounted, "He threatened to ruin my life, ruin my reputation, slander me that I was—saying that he would get me to lose my job in certain ways, things of that nature." Noyes also threatened to disclose private videos of Voges. On March 26, 2021, Noyes wrote: "You do know I'm going to put you in jail and ruin your rep period unless you come fess up. You think I'm joking your ducking on somethin[g]. I will never stop until your honest. That's a promise I will keep bitch." On April 9, Noyes wrote:

---

[1] Unless otherwise indicated, we quote Noyes's text messages verbatim.

The next ones are fuck videos. Fucking text me and block me cunt. . . . All I wanted was a conversation. Now you get this side of me. And fucking listen when I tell you I don't Track your car. Matter fact. I'll give you till 6 pm today to come over to my house and have that conversation. After that I'm going with it. Your choice. I'd turn right and come talk if you don't want the texts of you and girl talking shit about your boss emailed to their emails. . . . Here go the emails. . . . Don't text me begging. The next ones are going to get you a new job.

On April 10, Noyes wrote:

I've got over 7,000 ruin your ducking life photos and videos with contact numbers including a complete back up of your last phone that proves you cheated on me ready to ruin the rest of your life legally in this state. I think you're a wa[s]te[] of time but being you played me for a bit I figure might as well play back. Be[s]t of luck.

Noyes added, "Slut. I'm ruining your life tonight. Whore."

Voges testified that Noyes also tried to get into her bank account. She explained:

I had received text messages stating that a certain IP address or an iPhone was trying to get into my account and it was blocked for security reasons. This was tried at least three times in one day. I ended up having to contact [my bank]. I also went into one of their locations and was given IP addresses of who tried to get into my account, which I believe were him.

She also believed that Noyes had tried to access her Amazon account, her email account, and her phone account, "[s]everal times to the point where [she] had to get extra security put on to [her] account so that he could not access it."

Noyes apparently used a "spoofing app" to generate multiple phone numbers to contact Voges, including numbers that appeared to belong to friends and family but belonged to Noyes instead. Sometimes when she would answer a call, believing it to be from someone else, "it was [Noyes's] voice" on the line instead. On three occasions when Noyes called her, she

6

recorded the call so that she could prove that Noyes was continuing to call her. Copies of these recordings were admitted into evidence. When asked how many phone numbers and email addresses that she had to block over the course of Noyes's communication with her, Voges testified, "Dozens upon dozens. I couldn't give you an exact amount. I believe it's 60 to 80 phone numbers. Somehow he would text me from email addresses. I don't know if those are included as phone numbers or not, but I blocked those as well." Voges also testified that she changed her phone number "several times" to stop Noyes from contacting her but that somehow Noyes found her new numbers and continued to contact her.

Voges testified that Noyes's actions made her feel abused, harassed, "[d]epressed, sometimes suicidal, anxious, nervous, scared, terrified." When asked why she wanted a protective order, she testified, "Because I'm afraid for my life." When asked why she was afraid for her life, Voges answered, "Because I don't know what Jonathan is capable of after everything he's already done to try to ruin my life and sabotage me."

On cross-examination, Voges was asked if Noyes had ever hit or hurt her physically. Voges testified, "He has gotten physical, yes." She elaborated:

> He has grabbed me and pulled me off of a bed when he didn't want me laying on it. He kicked me in the chest. I had to sleep in a spare room at one point in time because I was not allowed in the bedroom. So I slept on an air mattress. He unlocked the door in the middle of the night, took a knife and blew the air mattress right from under me while I was sleeping on it.

The case was investigated by Detective Erin Newsome of the Comal County Sheriff's Department, who testified that Voges filed approximately nine police reports in April 2021, "reporting continued electronic communication and harassment from Jonathan Noyes." Newsome compiled the reports together, reviewed copies of text and voice messages that Voges

7

had provided to the police, and compared those messages to data that police had downloaded from Voges's phone. Newsome then compiled the information onto a spreadsheet documenting each date and time that Noyes and Voges had contacted each other, beginning on March 4, 2021, and continuing through April 20, 2021. A copy of the spreadsheet was admitted into evidence, as were screenshots of the numerous text messages that Noyes had sent to Voges and several that Voges had sent to Noyes. Newsome testified that Noyes had sent approximately 1,500 text messages to Voges while Voges had sent "[m]aybe 60 to 70" text messages to Noyes, "requesting [Noyes] to cease contact with her."

Newsome interviewed Noyes at his residence to discuss the investigation. Noyes told Newsome that "he would stop messing with Samantha Voges, that it was over alleged infidelity in the relationship." Newsome asked Noyes "if he used a different phone number to contact Samantha when she had blocked him," and he told her "that he had two cell phones but that there were also apps that gave different phone numbers." Newsome asked Noyes "if he had done that," and Noyes responded, "Yeah, at times."

Also during her investigation, Newsome recovered a tracking device that had been attached to "the wheel well under the front driver's side" of Voges's vehicle. She also learned that Noyes had used approximately 19 different phone numbers and multiple email addresses to contact Voges and confirmed that an IP address belonging to Noyes had attempted to access Voges's bank account. After completing her investigation, Newsome obtained an arrest warrant for Noyes and arrested him for stalking.

At the conclusion of the hearing, the district court found that there were reasonable grounds to believe that Voges was the victim of stalking by Noyes and that a protective order was necessary for the safety, welfare, and protection of Voges and the members

8

of her family. The district court's written order included findings that there were reasonable grounds to believe that Voges was the victim of stalking by Noyes and that the following prohibitions on Noyes were necessary for the safety, welfare, and protection of Voges and the members of her family and household:

(1) Communicating in any manner, including through a third party or social media, with Samantha Voges and her parents, except through Voges's attorney or a person appointed by the court;

(2) Engaging in conduct directed specifically toward Samantha Voges and her parents, including following the person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the person;

(3) Harassing, threatening or harming Samantha Voges and her parents;

(4) Going to or near the residence, place of business of Samantha Voges and her parents;

(5) Going within 200 yards of Voges's current or future residence and current or future workplace; and

(6) Possessing a firearm as defined by Section 46.01 Penal Code, unless the respondent is a peace officer as defined by Section 1.07 Penal Code actively engaged in employment as a sworn full time paid employee of a state agency or political subdivision.

The order further specified that "any license or permit to carry any concealed handgun for respondent is suspended for the duration of the lifetimes of both applicant and respondent" and that the order "shall continue in full force and effect for the duration of the lifetimes of both applicant and respondent." Noyes filed a motion for new trial, which the district court denied following a hearing. This appeal followed.

9

**Required findings**

In his first issue, Noyes asserts that the district court failed to make findings that he contends the district court was required to make when it issued the protective order. Specifically, Noyes argues that the district court was required to find that he was "likely in the future to engage in stalking," *see* Tex. Code Crim. Proc. art. 7B.052(2), and that he either: (1) committed an act constituting a felony offense involving family violence; (2) caused serious bodily injury; or (3) violated two prior protective orders, *see* Tex. Fam. Code §§ 85.001(d), 85.025(a-1). Noyes asserts that without these findings, the district court could not issue a lifetime protective order or any protective order that exceeded two years.

Noyes is conflating the requirements of a protective order under the Family Code with the requirements of a protective order under the Code of Criminal Procedure. "The Family Code allows the trial court to issue a protective order 'if the court finds that family violence has occurred and is likely to occur in the future.'" *Shoemaker v. State for Protection of C.L.*, 493 S.W.3d 710, 715 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting former Tex. Fam. Code § 81.001).[2] A family-violence protective order must satisfy the requirements of section 85.001 of the Family Code. *See* Tex. Fam. Code §§ 81.001, 85.001. One such requirement is that "[i]f the court renders a protective order for a period of more than two years, the court must include in the order a finding described by Section 85.025(a-1)." *Id.* § 85.001(d). The findings described in Section 85.025(a-1) are the following:

---

[2] A recent amendment to the Family Code eliminated the requirement that the court find that family violence "is likely to occur in the future." *See* Act of May 24, 2023, 2023 Tex. Sess. Law. Serv. Ch. 688 (H.B. 1432).

[T]he person who is the subject of the protective order:

(1) committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense;

(2) caused serious bodily injury to the applicant or a member of the applicant's family or household; or

(3) was the subject of two or more previous protective orders rendered:

(A) to protect the person on whose behalf the current protective order is sought; and

(B) after a finding by the court that the subject of the protective order has committed family violence.

*Id.* § 85.025(a-1).

Here, however, the State did not request a protective order under the Family Code. Instead, it requested a protective order under Chapter 7B, Subchapter A of the Code of Criminal Procedure, which requires only a finding that "there are reasonable grounds to believe that the applicant is the victim of sexual assault or abuse, stalking, or trafficking." Tex. Code Crim. Proc. art. 7B.003(a). The district court made that required finding here, both at the conclusion of the hearing on the State's application for a protective order and in its written order granting the State's application. No other fact findings were required. *See R.M. v. Swearingen*, 510 S.W.3d 630, 633 (Tex. App.—El Paso 2016, no pet.) ("No additional showings beyond status as a crime victim are required to obtain the order [under Subchapter A]."); *see also Netaji v. Roberts*, No. 03-19-00840-CV, 2021 WL 5312489, at *10 (Tex. App.—Austin Nov. 12, 2021, no pet.) (mem. op.) ("The trial court's protective order here includes its finding that '[r]easonable

11

grounds exist to believe that Applicant has been the victim of stalking.' This fact finding is the only one necessary under [Chapter 7B, Subchapter A] for issuance of the order.").[3]

In arguing that the requirements of the Family Code apply to protective orders under Subchapter A, Noyes relies on article 7B.008, which provides that "[t]o the extent applicable, except as otherwise provided by this subchapter, Title 4, Family Code, applies to a protective order issued under this subchapter." Tex. Code Crim. Proc. art. 7B.008. However, according to the plain language of the statute, the Family Code applies to Subchapter A only "to the extent applicable." *Id*. The findings required under section 85.025(a-1) of the Family Code apply to family-violence protective orders. Because the State did not seek a family-violence protective order here, section 85.025(a-1) does not apply.

We overrule Noyes's first issue.

**Evidentiary sufficiency**

In his second issue, Noyes argues that the evidence is insufficient to support "any findings" required by the protective order, including the district court's finding that a lifetime ban on his possession of firearms was necessary for the safety, welfare, and protection of Samantha Jo Voges and the members of her family and household. According to Noyes, "There is no evidence [he] is a future threat to anyone, at any future point in time." Without such

---

[3] Additional fact findings are required under Chapter 7B, Subchapter B of the Code of Criminal Procedure, which permits a party to request a protective order under the Family Code "at any proceeding related to a stalking offense." Tex. Code Crim. Proc. art. 7B.051(a). To obtain a protective order in such a case, the trial court must find, "in lieu of the finding that family violence occurred," that (1) probable cause exists to believe that a stalking offense was committed; and (2) the nature of the scheme or course of conduct engaged in by the defendant in committing the offense indicates the defendant is likely in the future to engage in stalking. *Id*. art. 7B.052. Because the State did not request a protective order under Subchapter B, those additional findings were not required here.

12

evidence, Noyes contends, the district court should not be permitted to impose a lifetime ban prohibiting him from engaging in certain actions, especially his constitutionally protected right to bear firearms.

### Standard of review

We review a trial court's decision to grant or deny a protective order under the Code of Criminal Procedure for legal and factual sufficiency of the evidence. *See State for Protection of P.B. v. V.T.*, 575 S.W.3d 921, 924 (Tex. App.—Austin 2019, no pet.). When conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). To prevail, an appellant must show that no more than a scintilla of evidence supports a finding on which the opponent had the burden of proof. *See Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156-57 (Tex. 2014); *City of Keller*, 168 S.W.3d at 826. More than a scintilla of evidence exists to support a finding when the evidence enables reasonable and fair-minded people to differ in their conclusions. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

When conducting a factual-sufficiency review, we consider all the record evidence and set aside the trial court's order only if the evidence is so weak as to make the order clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We defer to the fact finder's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Under either standard, we may not substitute our judgment for that of the trier of fact when the evidence falls within the zone of reasonable disagreement, and the trier of fact is

13

the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 816–17, 819–20, 822 (legal sufficiency); *Golden Eagle Archery*, 116 S.W.3d at 761 (factual sufficiency).

### *Governing law*

At the close of a hearing on an application for a protective order under Chapter 7B, Subchapter A of the Code of Criminal Procedure, "the court shall find whether there are reasonable grounds to believe that the applicant is the victim of sexual assault or abuse, indecent assault, stalking, or trafficking." Tex. Code Crim. Proc. art. 7B.003(a). If the trial court finds that the applicant is a victim of one of those offenses, it "shall issue a protective order." *Id*. art. 7B.003(b). "A protective order issued under Article 7B.003 may be effective for the duration of the lives of the offender and victim or for any shorter period stated in the order." *Id*. art. 7B.007(a). "No additional showings beyond status as a crime victim are required to obtain the order," including any threat of future harm to the victim. *R.M.*, 510 S.W.3d at 633 & n.2 (explaining that applicant for protective order previously "had to also prove reasonable fear of further harm from the alleged" offender but that "[t]he Legislature abrogated the fear of further harm requirement in 2011"). Thus, to uphold the issuance of the protective order in this case, the evidence must be sufficient to prove that Voges was the victim of stalking committed by Noyes.

As relevant here, a person commits the offense of stalking if he, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:

(1) constitutes an offense under Section 42.07 [harassment];

14

> (2) causes the other person . . . to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
>
> (3) would cause a reasonable person to . . . feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

Tex. Penal Code § 42.072(a)(1), (2)(B), (3)(D). A person commits the offense of harassment if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, he, among other things, sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another. *Id*. § 42.07(a)(7). "Electronic communication" includes emails, cellular phone calls, and text messages. *Id*. § 42.07(b)(1).

*Analysis*

In this case, the district court heard evidence that Noyes sent Voges over 1,500 text messages in March and April 2021. In these messages, Noyes mentioned Voges's parents on multiple occasions and threatened to go to their house; called Voges names such as "whore," "slut," and "cunt" and repeatedly accused her of "fucking" and "getting banged" by other men; and threatened to ruin Voges's life, destroy her reputation, cause her to lose her job, and send Voges's personal photos, videos, and messages to her friends and coworkers. Noyes also used numerous phone numbers and email addresses to contact Voges despite her repeated attempts to block his numbers and addresses, used a "spoofing app" to trick Voges into answering calls from Noyes that she believed were from others, followed Voges using a tracking device that he installed on her vehicle, and continued to contact her even after she told him repeatedly to stop. Voges testified that Noyes's actions made her feel abused, harassed, "[d]epressed, sometimes suicidal, anxious, nervous, scared, terrified." Voges further testified that she was "afraid for [her] life" because she did not know "what [Noyes] is capable of after everything he's already

15

done to try to ruin [her] life and sabotage [her]." Viewing this evidence under the applicable standards of review, we conclude that the district court had reasonable grounds to believe that Noyes, on more than one occasion and pursuant to the same scheme or course of conduct that was directed specifically at Voges, knowingly engaged in conduct that constituted harassment; caused Voges to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and would cause a reasonable person to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended. *See Dessens v. Argeroplos*, 658 S.W.3d 438, 446-47 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *Shoemaker*, 493 S.W.3d at 718-19; *see also Hoover v. Guillory*, No. 03-21-00421-CV, 2022 WL 3903124, at *4 (Tex. App.—Austin Aug. 31, 2022, no pet.) (mem. op.). Accordingly, the evidence is legally and factually sufficient to support the district court's finding that Voges was a victim of stalking so as to authorize the granting of a protective order against Noyes under Chapter 7B, Subchapter A of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. arts. 7B.003(b), 7B.007(a); Tex. Penal Code § 42.072.

We overrule Noyes's second issue.[4]

---

[4] In this issue, Noyes also asserts that the lifetime ban on his possession of firearms violates his constitutional right to bear arms, *see* U.S. Const. amend. II; Tex. Const. art. I, § 23, for the reasons explained in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, —— U.S. ——, 142 S. Ct. 2111, 2130 (2022) (concluding that to uphold firearm regulation, government "must affirmatively prove" that challenged regulation "is consistent with the Nation's historical tradition of firearm regulation"), and *United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023) (concluding that statute that prohibited possession of firearms by person subject to domestic-violence restraining order failed *Bruen* test and thus violated Second Amendment), *cert. granted,* 143 S. Ct. 2688 (2023). Noyes did not raise this challenge to the constitutionality of the statute in the court below, and he cannot raise it for the first time on appeal. *See* Tex. R. App. P. 33.1; *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003); *Eckchum v. State for Prot. of Ketchum*, No. 03-15-00270-CV, 2016 WL 3677122, at *6-7 (Tex. App.—Austin July 7, 2016, no pet.) (mem. op.). Noyes did argue in the court below that his Second Amendment rights were violated because there was no evidence of gun threats or gun violence presented at trial. However, as we have already explained, the only finding required to issue a protective order under the statute is that "there are reasonable grounds to believe that the applicant is the victim" of an offense such as

**Constitutionality of harassment statute**

We address Noyes's third and fourth issues together. In his third issue, Noyes asserts that he could not be subjected to a protective order based on his communication with Voges because "much of the content of this speech was protected by the Texas Constitution and the First Amendment" to the United States Constitution. Noyes characterizes his communication with Voges as "private communications between prospective spouses" and argues that even though his speech to her was "unpleasant," he had a constitutional right "to privately say a substantial part of it to his prospective spouse." We construe this issue as a complaint that the harassment statute that formed the basis for the district court's finding that Noyes engaged in stalking is unconstitutionally overbroad. In his fourth issue, Noyes asserts that the harassment statute is unconstitutionally vague and ambiguous. Specifically, he contends that the statute as currently written "leaves individuals unable to determine the underlying conduct proscribed by the statute."

"A statute may be challenged as overbroad, in violation of the Free Speech Clause of the First Amendment, if, in addition to proscribing activity that may be constitutionally forbidden, it sweeps within its coverage a substantial amount of expressive activity that is protected by the First Amendment." *Scott v. State*, 322 S.W.3d 662, 665 n.2 (Tex. Crim. App. 2010), *abrogated on other grounds by Wilson v. State*, 448 S.W.3d 418 (Tex. Crim. App. 2014). "A statute may be challenged as unduly vague, in violation of the Due Process Clause of the Fourteenth Amendment, if it does not: (1) give a person of ordinary intelligence a reasonable

---

stalking. Tex. Code Crim. Proc. art. 7B.003(a). The statute does not require evidence of gun threats or gun violence to restrict a person's Second Amendment rights.

opportunity to know what is prohibited and (2) establish definite guidelines for law enforcement." *Id*.

The Court of Criminal Appeals has recently held that the conduct regulated by the electronic-communications provision of the harassment statute "is non-speech conduct that does not implicate the First Amendment." *Ex parte Barton*, 662 S.W.3d 876, 884 (Tex. Crim. App. 2022). This is because the provision "criminalizes harassing conduct that, although it may include spoken words, is essentially noncommunicative," *id*. at 881 (citing *Scott*, 322 S.W.3d at 669–70), i.e., people who violate that provision "will not have an intent to engage in the legitimate communication of ideas, opinions, or information; they will have only the intent to inflict emotional distress for its own sake," *Scott*, 322 S.W.3d at 670. Because the statute does not implicate the First Amendment, "the statute is not susceptible to an overbreadth challenge." *Id*. at 885.

"As for whether the statute is unconstitutionally vague, because § 42.07(a)(7) does not regulate speech and therefore 'does not implicate the free-speech guarantee of the First Amendment,' Appellant, 'in making his vagueness challenge to that statutory subsection, was required to show that it was unduly vague as applied to his own conduct.'" *Id*. (quoting *Scott*, 322 S.W.3d at 670–71). Noyes has failed to make any such showing here.

We overrule Noyes's third and fourth issues.

**Exclusion of evidence**

Finally, in his fifth issue, Noyes asserts that the district court abused its discretion in excluding a voice-mail recording of Voges telling Noyes, in December 2020, while they were

still in a relationship, that she was going to ruin his life and ruin his business. The State objected on relevance grounds, and the district court sustained the objection.

"A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard." *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022). "There is no abuse of discretion if the trial court's ruling is within the zone of reasonable disagreement." *Id*.

"Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016) (citing Tex. R. Evid. 401). It would not be outside the zone of reasonable disagreement for the district court to conclude that evidence of Voges's conduct toward Noyes while they were still in a relationship was not relevant to the issue of whether Noyes had committed the offense of stalking Voges after their relationship had ended. Accordingly, we cannot conclude that the district court abused its discretion in excluding the evidence.

We overrule Noyes's fifth issue.

## CONCLUSION

We affirm the district court's protective order.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: November 22, 2023

19